THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE KING HORTON, Defendant-Appellant.

(No. 60021;

First District (4th Division)—May 28, 1975.

James J. Doherty, Public Defender, of Chicago (Thomas Flaherty and James N. Gramenos, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Michael T. Reid, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Willie King Horton, was charged by indictment with the murder of his wife, Mae Dell Horton, in violation of section 9—1 (a)(2) of the Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a) (2).) The right to a jury was waived by the defendant and upon trial by the court he was found guilty on April 11, 1973, of the crime of voluntary manslaughter. He was sentenced to serve a term of 4 to 12 years in the penitentiary.

The primary issue presented in defendant's appeal is whether the State proved beyond a reasonable doubt that the defendant was legally sane at the time of the shooting, after the defense had introduced medical evidence placing his sanity in issue. In defendant's reply brief on appeal it is further contended that the manslaughter conviction cannot stand in any event since the evidence proved, if anything, the crime of murder and not manslaughter.

The record shows that after the defendant was arrested and indicted, the court, on October 27, 1971, ordered Doctor Edward Kelleher of the Psychiatric Institute of the Circuit Court of Cook County, or one of his authorized assistants, to examine the defendant as to his mental condition and competency to stand trial. In a letter dated November 3, 1971, addressed to Joseph A. Power, Presiding Judge of the Criminal Division of the Circuit Court of Cook County, and signed by Doctor Richard A. Malek, psychiatrist for the Circuit Court Psychiatric Institute, the court was informed that as a result of an examination the defendant was found not competent to stand trial. Another earlier report, dated October 5, 1971, appears in the record, also identifying Doctor Malek as the examining physician, and describing Willie Horton, as "in need of immediate psychiatric treatment." Defendant was also found incompetent by Doctor Kelleher, on December 20, 1971, and in a competency hearing held on January 24, 1972. In July of 1972, Doctor Kelleher reported to the court, pursuant to order, that the defendant had improved as a result of treatment by the Department of Mental Health and was now able to understand the charges pending against him and cooperate with counsel in his

defense. By agreement, evidence was heard by the court and on October 5, 1972, the defendant was ordered competent to stand trial.

The report of proceedings reveals that the trial commenced on March 29, 1973. The defendant was represented by private counsel and waived the right to trial by jury. The court was informed that the defense of insanity was being interposed, and that most of the circumstances of the shooting of defendant's wife were not seriously in dispute.

Herbert Horton, one of the defendant's teen-aged sons, was the State's first witness. He had lived with his father, mother, and eight brothers and sisters in a two-story frame residence on Chicago's south side. He testified that all the children were home late in the evening of September 6, 1971, the night preceding his mother's death. Shortly after midnight, on September 7, 1971, his father, the defendant, Willie King Horton, awoke from sleep and left the house. He returned a few hours later, between 3 and 4 o'clock that same morning, and "started a disturbance, started arguing" with his wife, Mae Dell Horton. He was upset because she had let Herbert and his twin brother stay out until 11 P.M. the night before. After the argument, Mr. Horton left the house with Herbert's younger brother, Herman. Mr. Horton returned at about 8 or 8:30 on the same morning and another argument ensued between him and his wife. He again brought up the fact that Herbert and his brother had been out late the night before. He smelled of alcohol. Herbert heard his father threaten to kill his mother. After the argument had gone on for about an hour, Herbert slipped out of the house to call the police and did so. When Herbert returned, Mr. Horton, ascertaining that the police had been summoned, said "that if they came he would empty the gun into" his wife. After 5 or 10 minutes there was a knock at the front door. Mr. Horton, who was leaning on the side of the refrigerator, went up to the front door, and then came back. When he returned he fired a gun at his wife, and she screamed and fell. Herbert ran out of the back door and encountered a policeman in the gangway. He told the policeman his mother had been shot.

Herbert testified further than his father was self-employed, as a mover and as the owner of a furniture store. He and his brothers helped out, and every now and then his father employed some other men. During the months preceding the shooting, he saw his father every day, and he observed him conducting his business affairs—paying bills, moving people, delivering furniture. His father had quarreled with his mother at least five times prior to the day of the shooting. He struck her on one occasion with a chair and on two other occasions with his fist. Herbert had called the police at least five times when his parents were arguing.

On cross-examination Herbert agreed with a characterization of the

argument between his parents as "violent." Their hostilities had been building up for some time. His father would get into a rage and lose all control of himself. When asked if he had an opinion as to whether his father was or was not under the influence of liquor on the day of the shooting, he replied, "No, I don't think he was, no." On some of the other occasions when his parents argued he felt his father had been under the influence of alcohol. Although he testified his father had been drinking on the night in question, he didn't feel he had been drinking that heavily. He related that his father had been having some very big financial problems with his business, but there was "[n]othing unusual" about his demeanor, "he just mentioned that he had some problems, that is all." There were no arguments between his parents regarding the business. She did argue that he didn't give her enough money to run the house.

The following colloquy between defense counsel and Herbert Horton occurred near the end of the cross-examination:

"Q. On these occasions, the four or five arguments [in] which you told us that your father struck your mother, once slashed your mother with a knife, also the night that your father shot your mother, do you have an opinion as to whether or not he was acting in a normal manner on those occasions?

A. Yes, sir, normal to him, yes.

Q. Normal to him, but not normal to most people, is that right?

A. Yes.

Q. So in other words even prior to September 6, 1971, it was your belief that your father's conduct was abnormal to what most people's conduct is, is that correct?

A. No, no.

Q. Well, what was your opinion?

A. I think that he was—nothing wrong with him or nothing like that, he was acting all right prior and everything else."

Officer Donald Jennings of the Chicago Police Department testified next for the State that he went to the defendant's premises at about 9:30 A.M. on September 7, 1971. When he arrived he met another police officer and together they knocked at the front door. A man whom they identified as the defendant peered through a window in the door and said "Just a minute." He left the door and then the officer heard several gunshots, and a woman screamed. After an unsuccessful attempt to force open the door, Officer Jennings ran around the side of the house toward the rear while the other officer summoned help. In the gangway Jennings met the defendant's son, Herbert. He was quite excited and screamed that his mother had been shot. Jennings then heard the other officer call and saw the defendant coming out of the front door with his hands over his

head. Defendant said "I did it, don't shoot, you know me." After being taken into custody he said, "I told that bitch not to call the police again on me," and said that the last time she called the police on him that the police had beat him up. After other officers took custody of the prisoner, Officer Jennings returned to the house, where he saw excited children crying and screaming in the living room and the victim, Mrs. Horton, dead, lying face down in a pool of blood on the kitchen floor. At the police station, he advised the defendant of his constitutional rights, enumerating them in court, and the defendant replied that he understands. Defendant was interrogated by another officer and stated that "We had been arguing and fighting all night, and I got tired of it." Officer Jennings filled out an arrest report from information he received from the defendant, which included his name, address, birth place, social security number, height, weight, and other physical characteristics. The officer noticed nothing unusual about him, and he responded directly to the questions. On cross-examination, Officer Jennings said that the defendant appeared nervous and excited. His breath smelled moderately of alcohol, and the officer felt he was "to some degree" under the influence of alcohol.

Investigator Leo Wilkosz of the Chicago Police Department next testified for the State that he spoke to the defendant in an interrogation room at the Seventh District police station at about noon on September 7, 1971. He advised the defendant of his constitutional rights, and the defendant responded that he wished to talk to an attorney. He had no further conversation about the incident with the defendant. The investigator tried unsuccessfully to contact the attorney that day. On cross-examination, Wilkosz said that he was 3 to 5 feet away from the defendant during their conversation and that he did not notice an odor of alcohol on the defendant's breath from that distance.

Doctor Edward J. Kelleher, Director of the Psychiatric Institute of the Circuit Court of Cook County, was the sole witness called by the defense. The State stipulated that he was an expert in the field of psychiatry and it was not necessary to qualify him. He testified that the first examination of the defendant was made by Doctor Richard Malek on October 5, 1971, at the Institute. It was the usual psychological examination followed by a personal examination by the psychiatrist. Doctor Kelleher first examined the defendant himself on December 6, 1971, and took into account the opinion of Doctor Malek regarding the defendant's condition. He also examined him on December 20, 1971. At that time he was of the opinion that the defendant "was suffering from a psychosis, a confused state, possibly schizophrenic." He described psychosis as a severe form of mental illness which in laymen's terms is called a form of insanity, and

said that a schizophrenic type is one of the most serious and most frequently encountered, characterized by a breaking of contact with reality and a split personality with delusions and hallucinations. He was asked whether a person suffering from those illnesses could appear to be sane at times, and insane at other times, and he answered in the affirmative. He was then asked:

"Q. Doctor, based upon your examination of the defendant, Willie King Horton, based upon what you had read in regards to Doctor Malek's examination, and based upon the things that were told you by the social workers, do you have an opinion based on a reasonable degree of medical certainty as to whether or not Willie King Horton, the date of the offense, September 7th, 1971, was suffering from a mental illness?

A. Yes, I do.

Q. What is that opinion?

A. It is my opinion that on the date of September 6th [*sic*], I believe it was, 1971, that Willie King Horton was suffering from a mental illness.

Q. Do you have an opinion as to whether or not he could conform his conduct to the requirements of the law?

A. I do.

Q. What is that opinion?

A. It is my opinion that he was too mentally ill to conform his conduct to the requirements of law."

On cross-examination the doctor stated, *inter alia, t*hat he frequently saw people go into a retroactive depression following some type of traumatic activity, such as the violent shooting of one's wife.

The defendant argues that the State had the burden of proving him sane beyond a reasonable doubt after he introduced evidence placing his sanity in issue, and that the State failed to meet that burden. It is urged for that reason that the conviction should be reversed.

■■ The State concedes that once the issue of sanity is raised by the defense, the burden of proving sanity beyond a reasonable doubt shifts to the prosecution (*People v. Gold,* 38 Ill.2d 510, 232 N.E.2d 702), and it acknowledges that sufficient evidence was presented here to saddle the prosecution with the burden of proving that issue. It is asserted by the State however that it met its burden and that the trial court's finding of defendant's sanity at the time of the shooting is abundantly supported by the evidence.

The Illinois Criminal Code, section 6—2, provides:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental de-

fect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1971, ch. 38, par. 6—2.

■■ We find it imperative to emphasize that it is not our function as a reviewing court to weigh the evidence and not for us to determine the credibility of the lay and expert witnesses. It is initially for the trier of the fact to determine from all the evidence whether the State satisfied its burden of proof in regard to the issue of sanity. We will not disturb the decision of the fact finder who saw and heard the witnesses unless it is manifestly against the weight of the evidence. See *People v. Ford,* 39 Ill.2d 318, 235 N.E.2d 576; *People v. Thomas,* 409 Ill. 473, 100 N.E.2d 588; *People v. Burress,* 1 Ill.App.3d 17, 272 N.E.2d 390.

The defendant places much emphasis on the medical testimony of Doctor Kelleher and the absence of any expert testimony on behalf of the State in urging reversal. But there is no requirement that the State present expert medical testimony of its own when confronted with a sanity issue. (*People v. Ureste,* 7 Ill.App.3d 545, 288 N.E.2d 45.) It is for the trier of the fact to determine from *all* the evidence whether the State has fulfilled its burden.

Although Doctor Kelleher did testify that in his opinion defendant was legally insane at the time of the act, he first examined the defendant on December 6, 1971, which was 3 weeks after the shooting. He relied a good deal on the report of Doctor Malek's examination of the defendant about a month after the incident. He admitted the possibility of a person suffering a retroactive depression following the trauma of an incident such as this.

There was no indication that the defendant had any prior history of mental illness. He maintained a single-family dwelling for his wife and nine children. He was a self-employed businessman who owned and operated a furniture store and moving business. His son, Herbert, who was employed by him, lived with him and saw him daily, testified that his father conducted his normal business affairs. When asked on cross-examination whether, in his opinion, his father had acted abnormally prior to the shooting he replied, that there was "nothing wrong with him or nothing like that, he was acting all right prior and everything else." He described the volatile situation which had existed between his parents prior to the shooting. On at least five previous occasions he had summoned the police because of arguments between his parents. On at least three occasions his mother was hospitalized because of blows or cuts inflicted

by his father. This history indicates that the shooting death of Mrs. Horton was a culmination of long-standing hostility between the couple.

The defendant's own statements immediately after the shooting support such a view. When the police attempted to force open the door after hearing gunshots, the defendant surrendered himself with his hands raised saying "I did it, don't shoot, you know me." He told the police "I told that bitch not to call the police again on me," and explained that the last time she had done that the police beat him up. Later he said "[w]e had been arguing and fighting all night, and I got tired of it."

The evidence further shows that when the defendant was advised of his *Miranda* rights he responded that he understood and wished to exert them by talking to his attorney before discussing the incident further. He told them the name of his attorney and where he could be contacted. Officer Jennings testified he noted nothing unusual about the defendant. He said the defendant appeared coherent and responded directly to the questions directed to him. On cross-examination he said the defendant was nervous and excited, but that there were no physical signs of shaking. He smelled alcohol on his breath.

■■ Based on the entire record, there is sufficient evidence to sustain a finding that the defendant was legally sane when he killed his wife. Although it might be justified in one sense to characterize the circumstances of the shooting as "bizarre," in the same sense one could characterize most any crime of violence as "bizarre." Such an observation does not compel a finding of mental disease or defect sufficient to exonerate one from criminal liability.

In the reply brief filed in this court, defendant briefly suggests, in the alternative, that the evidence points clearly to murder, not manslaughter. It is urged that if we do not reverse the trial court's finding of sanity we should reverse the conviction of manslaughter because the defendant was not proved guilty of that offense.

Under an indictment for murder the court may find the defendant guilty of the lesser included offense of voluntary manslaughter where the evidence supports a conviction for the lesser charge. Where there is any evidence in the record upon which the judge could find the defendant guilty of voluntary manslaughter rather than murder, that finding will not be disturbed on review. See *People v. Gajda,* 87 Ill.App.2d 316, 232 N.E.2d 49.

■■ The record reveals that there were arguments and hostilities between the couple on the day of the shooting which had been building up for some time. On at least five previous occasions the police had been called. On at least three occasions there had been physical violence. On the morning of the shooting the defendant and his wife had been arguing all

night long. He complained that she permitted the children to stay out too late at night. He told his son, Herbert, that if the police came this time he would empty his gun into his mother. Upon seeing the police he pulled out a gun and shot her. These facts support a finding that the killing occurred in the heat of intense passion resulting from serious provocation. The courts have consistently upheld convictions of voluntary manslaughter where the killing was preceded by arguments of similar intensity and duration. See *People v. Rodriguez*, 129 Ill.App.2d 1, 262 N.E. 2d 815; *People v. Stepheny*, 76 Ill.App.2d 131, 221 N.E.2d 798.

For the reasons set forth above, we affirm the defendant's conviction.

Affirmed.

ADESKO and JOHNSON, JJ., concur.