THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BARRY BLOODWORTH, Defendant-Appellant.

Fifth District   No. 77-167

Opinion filed February 6, 1979.

342

Michael J. Rosborough and E. William Hutton, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas Byron, State's Attorney, of Edwardsville (Robert C. Perry and James G. Condon, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Defendant, Barry Bloodworth, was convicted of murder in the Circuit Court of Madison County following a jury trial and sentenced to a term of 25 to 50 years imprisonment. On appeal, defendant contends his conviction must be reversed on the grounds that the State failed to prove his sanity at the time of the killing beyond a reasonable doubt and because of certain allegedly prejudicial remarks made by the prosecution during closing arguments concerning defendant's assertion of the insanity defense. Defendant also contends that the sentence imposed upon his conviction was excessive.

Defendant was charged by information with the shooting death of Greg Ehlers on December 7, 1975. At trial, defendant did not deny committing the offense; however, he asserted the affirmative defense of insanity. The State presented the testimony of several witnesses for purposes of identifying the defendant and describing his behavior on the day in question and a few days prior thereto.

Janis Biggs testified that she had been dating Greg Ehlers for approximately one year prior to his shooting death on December 7, 1975. She stated that she met the defendant in mid-November, 1975, when he began living with her neighbor Bruce Dean in his trailer. Biggs related that Ehlers and the defendant had an argument concerning her on December 4, 1975, but that Ehlers was not armed nor did he make any significant threats towards the defendant. She recounted that from that day until the day of the shooting she saw the defendant on several occasions and was, in fact, unable to convince the defendant to leave her alone.

Biggs testified that the defendant slept on her living room sofa for several hours on December 5, 1975, after he had taken some pills and complained of a headache. When he awoke, he was coherent and carried on a conversation with her. Later that evening, while still in Biggs' trailer, the defendant attempted to write a list of possessions he had previously lost in a fire and became confused as to which of his possessions had been destroyed and which had been salvaged. Biggs stated that when the defendant left her trailer later that evening he appeared "dopey," walked unsteadily and his speech was slurred. She related that he returned twice later that evening and on each occasion told her that he wanted to marry

her and promised that he would never take pills again. The following morning, the defendant and Bruce Dean ate breakfast with Biggs at which time the defendant proposed marriage to Biggs and acted somewhat unsure of his presence at Biggs' trailer.

Biggs recounted that she spent the evening of December 6, 1975, at a girlfriend's home in order to escape the defendant's constant attention and marriage proposals. When she returned to her trailer on the morning of December 7, 1975, she discovered her front door was unlocked and living room lights on. A few minutes later, the defendant appeared at her door, informed her that he had spent the evening before in her trailer and proposed marriage which she again refused. Biggs related that she then told the defendant to leave her home and that he complied with her request, but he returned shortly thereafter only to be refused entry again. She stated that she was familiar with the symptoms of stimulants and depressants and that the defendant showed no signs of having taken drugs that morning since he followed her directions, spoke clearly and was not hysterical. According to Biggs, after the defendant left her trailer the second time, Greg Ehlers and her mother arrived and entered her residence. Approximately one hour after they arrived, the defendant began telephoning Biggs and during one such call asked to speak with Ehlers. Shortly after the last telephone call, the defendant appeared at her front door whereupon Ehlers walked outside apparently to speak with him. After a few minutes, during which time Biggs recalled hearing mumbled conversation between the two men, Biggs heard several gunshots fired followed immediately by the defendant's shouted demands that she unlock her front door and allow him entry into the trailer. Biggs stated that she looked outside through a front window and observed the defendant standing over Ehlers who was lying on the ground. She recalled hearing two more gunshots whereupon she telephoned the police while the defendant persisted in his attempts to enter her home.

Bruce Dean testified that he observed the encounter between Ehlers and the defendant on December 4, 1975, and described it as a heated argument during which each man physically threatened the other. According to Dean, Ehlers and the defendant met again shortly after their argument at which time Ehlers apologized to the defendant for his behavior. Dean stated that the defendant acted somewhat unusual on the morning of December 6, 1975, in that he stumbled around and made certain remarks to Dean which prompted him to strike the defendant and render him unconscious. Dean recounted that upon questioning the defendant the following day, the defendant told him he could not remember his behavior on the previous morning. Dean related that he took the defendant's gun and holster from him that day, but returned

them to the defendant the following morning, December 7, at the defendant's request after first loading the gun. He described the defendant as being stable and coherent at that time.

Roger Bloodworth, the defendant's cousin, testified that the defendant visited him on the morning of December 7, 1975, at which time he appeared nervous and upset. He related that the defendant's hands were shaking and that he was crying as he told Bloodworth that he could not remember certain recent incidents and that he suffered blackouts. Bloodworth recalled that the defendant regained his composure after he suggested, and the defendant agreed, that he seek psychiatric help.

The arresting officer, J. W. Apperson, testified that when he arrived at the scene of the shooting he found the defendant standing over Ehlers with a gun in his hand. The defendant surrendered peacefully and informed Apperson that he was also carrying a pocket knife. Apperson stated that the defendant's demeanor was excited, but no more so than his own. Officer Don Knight testified that the defendant told him that he shot Ehlers until the gun would no longer fire, that he realized that Ehlers was dead, and that he was aware of the seriousness of the incident. The defendant told Knight that he had taken precautions to avoid offending the arresting officer, such as holding the gun between his thumb and forefinger. He also asked Knight how much time he would get for the killing.

The defendant testified that he first met and began dating Janis Biggs in November 1975, and that he was aware that she was also dating Greg Ehlers. He stated that during his initial encounter with Ehlers on December 4, 1975, only Ehlers made threats and that one of Ehlers' companions had a gun in his belt. The defendant related that he took several amphetamines on the morning of December 5, 1975, and that he saw a physician that afternoon to whom he complained of headaches and was given a prescription for Valium and sleeping pills. According to the defendant, he took some of the prescribed drugs that day and had virtually no recollection of the events of the following days until after the shooting on December 7, 1975. As for the shooting, the defendant recalled Ehlers reaching into his pocket before he shot him. He stated that if he shot Ehlers it was because he was tremendously afraid of him. The defendant testified to a several year history of drug usage including amphetamines, barbiturates, sedatives, hallucinogens as well as consumption of alcohol. He further testified to a history of blackouts which lasted from several hours to a few days and that some of these blackouts had occurred when he had taken no drugs. He related that he often felt people were "after him," watching and monitoring him by way of various electronic devices such as toasters and telephones. He also stated that he was frequently followed by airplanes and automobiles.

Garnett Bloodworth, the defendant's father, stated that the defendant had once complained to him that airplanes were watching him which on that occasion caused him to run into his father's house to escape from them. He also testified that approximately two weeks before the shooting, his son had told him that someone's automobile antenna was following him.

The defendant called a psychiatrist, Dr. Fred Bergmann, and a psychologist, Dr. Gene Gianladis, to testify as to his mental condition at the time he shot the decedent. Dr. Bergmann saw the defendant once approximately three months after the shooting incident. Bergmann testified that the defendant was suffering from a mental defect at the time of the offense which, while allowing him to appreciate the criminality of his conduct, caused him to lack substantial capacity to conform his conduct to the requirements of the law. He described defendant's mental condition as a schizophrenic-like state with depression and paranoia related to poly-drug usage. According to Bergmann, a person suffering from such a mental condition was like a time-bomb and, under certain circumstances, could explode at anytime although he would react normally to most stimuli and in most social situations. Bergmann stated that the circumstances at the time of the shooting were such that the defendant suffered from a loss of control causing him to shoot Ehlers in response to Ehlers' sudden movements. Bergmann related that he had not read any of the police reports or statements made by the defendant after his arrest, nor had he interviewed anyone who was with the defendant on the day of the offense. He admitted that the diagnosis of a past condition was uncertain, and he could recall no study showing that such a condition could be determined accurately. He further testified that the defendant seemed frightened and was upset by sudden movements in his office during the examination, although he admitted that this behavior could have been induced by recent drug usage and that he had not conducted a blood test to explore this possibility.

Dr. Gianladis testified that he interviewed the defendant on two occasions several months after the incident and that he administered several tests. He described the defendant as having an affective disturbance in the form of depression as well as a cognitive disturbance in the form of transient and periodic paranoid thinking. He admitted that the defendant's impending trial could have affected some of the tests he conducted as well as the interviews. Gianladis stated that the defendant's reactions and general appearance during the interview could have indicated some condition other than depression such as overmedication, but that no blood tests had been taken to determine whether the defendant was under the influence of any drugs.

Dr. Joseph Shuman testified for the State as an expert witness. From

his examination of the defendant and the facts assumed in the hypothetical question propounded to him, he diagnosed the defendant as having a paranoid personality; however, he concluded that the defendant had substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law at the time of the offense. According to Shuman, the defendant showed no evidence of organic brain disease, schizophrenia or psychosis during his interview. He did state that he would like to know more about the defendant's fear of automobiles, aircraft and antennas because these fears could be a sign of schizophrenia; however, he concluded that none of the additional facts posed to him during cross-examination altered his basic opinion. He further testified that many persons behaved as the defendant did in sobbing, crying and threatening suicide, but that this behavior does not mean such persons are psychotic.

During closing arguments to the jury, the prosecutor made several comments regarding the defense of insanity. He pointed out to the jury that the defendant was not in a mental hospital or shackled, and he referred to the condition of insanity as being "bonkers" and "goofy." The prosecutor remarked to the jury that if the defendant knew what he was doing he should be held responsible for his actions, and in several instances referred to the insanity defense as an excuse. No objections to any of these remarks were made by defense counsel at trial, nor were these alleged errors raised by the defendant in his post-trial motion. At one point during his argument, the prosecutor, commenting generally upon excuses, began to remark about the multiple killings committed by a sniper on the campus of the University of Texas several years ago. This comment was immediately objected to by defense counsel and sustained by the trial court which ordered the jury to disregard the remark.

The jury returned a verdict of guilty and the defendant was sentenced to a term of 25 to 50 years imprisonment.

■■ ■ Defendant initially contends that the State failed to establish his sanity at the time of the offense beyond a reasonable doubt and, therefore, his conviction for murder must be reversed. In Illinois, all persons are presumed sane; however, once a defendant presents sufficient evidence to raise a reasonable doubt as to his sanity at the time of the offense the State must prove defendant's sanity beyond a reasonable doubt as a necessary element of its case. (*People v. Redmond*, 59 Ill. 2d 328, 320 N.E.2d 321 (1974); *People v. Skeoch*, 408 Ill. 276, 96 N.E.2d 473 (1951).) In the instant cause, the jury was given an instruction on the defense of insanity and the State does not challenge defendant's assertion that he initially met his burden of raising the issue of insanity. Thus, the burden fell upon the State to prove defendant's sanity as an element of the crime charged. In this regard, the State is not required to

present expert medical testimony when confronted with the issue of insanity (*People v. Deizman*, 44 Ill. App. 3d 829, 358 N.E.2d 1208 (1st Dist. 1976); *People v. Horton*, 29 Ill. App. 3d 704, 331 N.E.2d 104 (1st Dist. 1975)), and a jury may properly conclude that the defendant was sane at the time of the offense by accepting lay testimony over expert testimony. (*People v. Spears*, 63 Ill. App. 3d 510, 380 N.E.2d 423 (5th Dist. 1978).) Hence, the issue of the defendant's sanity at the time of the offense was a question of fact to be determined by the jury, and its finding of sanity will not be disturbed unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice. (*People v. Ford*, 39 Ill. 2d 318, 235 N.E.2d 576 (1968); *People v. Banks*, 17 Ill. App. 3d 746, 308 N.E.2d 261 (1st Dist. 1974).) In our view, the jury in the instant case correctly determined that the defendant was sane at the time he killed Greg Ehlers.

In asserting the defense of insanity, the defendant relied primarily upon the testimony of Gene Gianladis, Ph.D., and John Bergmann, M.D. These experts did not concur in their diagnosis of the defendant and, in fact, Gianladis' testimony was supportive of Bergmann's testimony only to the extent that the defendant was presently suffering from a mental defect. Even in this regard, the two men were not in complete agreement. Rather than describing defendant's mental defect as a drug-induced schizophrenic-like state as Dr. Bergmann testified, Dr. Gianladis stated the defendant had an affective disturbance in the form of depression as well as a cognitive disturbance in the form of transient and periodic paranoid thinking. Both men failed to rule out medication as a basis for defendant's behavioral symptoms exhibited during his interviews. While Dr. Bergmann did testify that the defendant was insane at the time of the offense, he restricted his opinion to the volitional aspect of the defense and to the time the trigger was pulled, although he admitted the uncertainty of assessing a prior mental state. Moreover, defendant's expert testimony was based upon interviews conducted long after the offense which could have been affected by defendant's apprehension over his impending trial. In addition, the testimony of defendant's expert witnesses was criticized by the State's expert witness, Joseph Shuman, M.D. In Dr. Shuman's opinion, the defendant was sane at the time of the offense. He agreed with the defense experts that the defendant was paranoid, but he described this mental condition as a personality disorder rather than a mental disease or defect. While Dr. Shuman stated that he would have liked to know more about the defendant's fear of aircraft, automobiles and antennas since it could be a sign of schizophrenia, he concluded that none of the hypothetical questions which were posed to him altered his basic opinion.

In view of the foregoing, we believe that the State sufficiently

rebutted the defendant's expert testimony that he was insane at the time of the offense. In the same way, we are of the opinion that the lay testimony regarding the defendant's behavior at the time of the offense compels the conclusion that the defendant was sane.

The defendant argues that the lay testimony established a history of irrational behavior which continued up to the day of the shooting. We have already set forth that conduct during the few days immediately preceding the offense. We believe that the testimony regarding defendant's behavior prior to the offense, while depicting actions which were occasionally paranoid and impulsive, did not necessarily indicate insanity. The defendant's friends and acquaintances who were familiar with his drug-taking behavior saw no reason to prevent him from carrying a loaded gun on the day of the offense. Nor was there any reason why they should have done so, because the defendant's behavior was marked by rational response, such as taking directions. Aside from the defendant and his father, no witnesses testified to the defendant's fear of automobiles or aircraft, or his belief that he was frequently being monitored by electronic devices. In regard to the defendant's use of drugs, he himself testified that he last took drugs two to three days prior to the offense. The testimony concerning defendant's behavior at the time of the offense did not indicate that it was irrational. He sought out his victim who was unarmed, and talked with him for a few minutes outside Janis Biggs' trailer. The defendant then fired more than one shot at Ehlers, attempted to enter Biggs' trailer, and fired several more shots. Such behavior, rather than indicating insanity, could certainly be construed as a culculated effort to slay the victim. Similarly, the defendant's behavior shortly after the offense showed conformity to the requirements of the law and was not irrational. He was cooperative with the police, able to answer questions and was curious as to the term of imprisonment he could expect as a result of his actions.

■■ We are of the opinion that the balance of the expert and lay testimony in the present case was strongly in favor of a finding of sanity at the time of the offense. We conclude that the State proved beyond a reasonable doubt that the defendant was sane at the time he committed the offense.

Defendant next contends that he was denied a fair trial as a result of certain prejudicial remarks made by the prosecutor during closing arguments. The defendant argues that these remarks, previously set forth herein, misstated the defense of insanity and prejudiced the jury against the assertion of the defense.

In general, the scope, substance and style of closing argument must be left to the discretion of the trial court which is in a superior position to determine the real effect of any statement which might be considered prejudicial. (*People v. Fain*, 41 Ill. App. 3d 872, 355 N.E.2d 61 (1st Dist.

1976).) Moreover, the remarks of counsel cannot constitute reversible error unless it is determined that they influenced the jury in such a manner as to result in substantial prejudice to the defendant. *People v. Spears*, 63 Ill. App. 3d 510, 380 N.E.2d 423 (5th Dist. 1978); *People v. Gerecke*, 45 Ill. App. 3d 510, 359 N.E.2d 1178 (4th Dist. 1977).

■■■ We initially note that except for one of the prosecutor's comments, none of the challenged remarks were objected to at trial. Hence, as a general rule we would consider any issue as to them to be waived. (*People v. Skorusa*, 55 Ill. 2d 577, 304 N.E.2d 630 (1973); *People v. Spears*.) We would find, however, that they did not prejudice the defendant even if they had been properly objected to. Instead, we are of the opinion that the remarks, when examined in context, were permissible comments and arguments based on legitimate inferences deducible from the evidence as well as on the evidence itself. We agree with the defendant that the prosecutor's remark regarding the Texas murders was improper. However, that statement was the only reference to that crime and we believe the trial court cured any impropriety by promptly instructing the jury to disregard the statement. Considering the nature of the comments of which the defendant complains and the substantial evidence showing beyond a reasonable doubt that the defendant was sane at the time of the offense, we do not believe that the remarks constituted a material factor in the conviction or resulted in prejudice to the defendant. Therefore, the jury's verdict will not be disturbed.

Defendant finally contends that the trial court abused its discretion in sentencing him to a term of 25 to 50 years imprisonment upon his conviction. He cites his age, 24, family and employment history, lack of any prior criminal convictions and his mental condition at the time of the offense as factors which dictated a lesser minimum sentence. The State maintains that the sentence imposed was proper because it was within the statutory limits and justified by the nature and circumstances of the offense.

Under Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)), a reviewing court may reduce a sentence which is within statutory limitations only when the trial court abused its discretion in sentencing (*People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977)). The authority granted reviewing courts by this rule should be exercised with considerable caution, and with full recognition of the trial court's superior opportunity, during the course of trial and the hearing in aggravation and mitigation, to assess the appropriate punishment. *People v. Caldwell*, 39 Ill. 2d 346, 236 N.E.2d 706 (1968).

■■ The record in the instant case reveals that the trial court based its sentence upon a consideration of all proper factors. The court considered

the presentence report, the trial evidence, the evidence in aggravation and mitigation, and the sentencing recommendations of both parties. The court specifically noted that the victim was shot while standing and again repeatedly after he had fallen, and stated that the sentence of 25 to 50 years was not only reasonable, but might be considered by some to be lenient. It is clear from the record that the court was aware of the mitigating factors in the case as presented in the presentence report, yet felt that the seriousness and circumstances of the offense compelled a sentence at least as severe as 25 to 50 years. In view of the foregoing, we cannot say that the trial court abused its discretion in imposing sentence in the instant case.

For the reasons stated above, the judgment of the Circuit Court of Madison County is affirmed.

Affirmed.

G. MORAN, P. J., and KUNCE, J., concur.