THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JERALD D. ROBERTS, Defendant-Appellant.

Fifth District   No. 77-306

Opinion filed May 1, 1979.

Michael J. Rosborough and Phillip A. Kramer, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Raymond W. McCamy, State's Attorney, of Robinson (Raymond F. Buckley, Jr., and Ann E. Singleton, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KUNCE delivered the opinion of the court:

Defendant-appellant Jerald Roberts was found guilty of the offenses of murder, attempt murder, aggravated kidnaping, aggravated battery,

and two counts of aggravated assault after a bench trial in the Circuit Court of Crawford County. On appeal he contends that the prosecution of the case by the Attorney General was improper and in excess of his authority; that the prosecution failed to prove beyond a reasonable doubt that the defendant was sane at the time he committed the instant offenses; and that the court below erred in entering a judgment of guilty on charges of aggravated kidnaping and aggravated assault arising out of a series of closely related acts.

The prosecution was conducted solely by two assistant attorney generals. The evidence adduced at trial revealed that shortly after an argument with his ex-wife in a bar, the defendant walked back into the bar where his ex-wife was sitting with her sister and another man, shot the man in the head with a pistol at close range, and then mortally wounded his ex-wife by shooting her once in the side and once in the back as she attempted to escape. The defendant then attempted three times to shoot the bartender as he approached the defendant unarmed, but each time the pistol misfired. When the bartender reached the defendant, the defendant struck him on the head with the pistol, knocking him to the floor. The defendant then left the bar, commandeered an automobile from a young woman in a laundromat down the street, and forced the young woman at gunpoint to drive the car out of town. After a high-speed chase, the car was stopped after an unsuccessful attempt to run a road block, and the defendant was apprehended after a police officer shot him in the head.

Less than a month before the events involved in this case, the defendant and his ex-wife had been divorced. Only a few days prior to the killing, according to the defendant's testimony, he had learned of his wife's overnight trip to St. Louis with another man. The tie rod in his automobile had broken, and he suspected that it had not been accidental.

The defendant testified that he did not remember going back to his trailer to obtain his gun after the earlier argument with his ex-wife. He did remember being back in the bar standing beside the booth where his ex-wife and the man were sitting:

> "I was standing there and somehow the gun was in my hand; Larry stood up; Brenda stood up; she took both hands and shoved Larry into the gun and there was an explosion. I turned and I looked down and she was, Brenda was standing in front of the bar about right in here gesturing with her hand to the bartender, and then she just fell on the floor."

The next thing he claimed to remember was waking up in the hospital. He did not remember the events in the laundromat, the chase by the police, nor being shot in the head. He testified that he did not intend to kill his wife nor to shoot the man she was sitting with in the bar.

A witness called by the State testified that he had ridden home with the

defendant from a party at about the time of the defendant's divorce. The witness testified that the defendant told him that he thought his wife's sister was responsible for the divorce, that the sisters were lesbians, and that it made him so angry that he could blow his wife's head off. Another witness, a cousin of the man who was shot by the defendant, testified that the defendant told him the day before the shootings that he should tell his cousin to leave the defendant's ex-wife alone and to stay away from her. Another witness who talked with the defendant the night before the shootings testified that the defendant asked him if he knew that his ex-wife was going out with the man who was later shot. When the witness indicated that he thought the two had been dating, the defendant told the witness to tell Larry, the victim, that "if he liked breathing to stay away from her." Another witness testified that on the same evening, the day before the shootings, the defendant told him that he would be reading the defendant's name in the newspaper. When asked why, the defendant said, "I'm going to blow my old lady's shit away."

Patrons of the laundromat where the defendant fled after the shootings testified that the defendant informed them that he had already shot a man, so they had better do as he said. He asked whether anyone had a car, and when the young woman who ended up as the unwilling driver in the chase with the police indicated that she had one, he asked which one it was and how much gas was in it. He spoke distinctly and held his gun still. During the chase, when the police officers would get close to the car in which the defendant was riding and shine their spotlight into the car, the defendant would put the gun up to the driver's head and pull back the hammer until the light was turned out. A doctor at the hospital where the defendant was taken testified that he told the defendant that he was going to die either as a result of the gunshot wound or in the electric chair. The defendant responded that he was not going to die and that he knew that there was no capital punishment in Illinois because he had checked on it recently. The doctor testified that the defendant said, "Hurrah, Hurrah, I've killed her, I've killed her," when he was informed that his ex-wife was dead.

The defense called two expert witnesses in support of the insanity defense. Dr. Albert Ludin, a physician specializing in psychiatry, testified that he had examined the defendant at the instance of defense counsel. At the time that he saw the defendant, he was "completely clear and without mental aberration." In response to a lengthy hypothetical question propounded by defense counsel, Dr. Ludin rendered the opinion that the defendant was "legally insane" after the first shot was fired. "After that he lost all control and did not know any more what he was really doing, what he was supposed to do, what conformed to law. He was acting on an emotional basis and no longer with any reasonable or rational thought." On cross-examination, Dr. Ludin testified that the defendant was

suffering from a mental disease at the time he shot his ex-wife and her male companion. He stated that the defendant had suffered personality changes, and that he was "temporarily insane" at the time of the shootings. Asked repeatedly by the prosecution what mental disease the defendant was suffering from, Dr. Ludin eventually gave the response that it was "a temporary mental aberration" or a "temporary psychosis." Dr. Ludin admitted that in a previous written report he had indicated that the reason for the defendant's inability to conform his conduct to the requirements of law was because of his voluntary intoxication.

Eugene L. Ringuette, a clinical psychologist, testified that he also had examined the defendant at the insistence of the defense, and had administered certain psychological tests. Ringuette answered a hypothetical question propounded by defense counsel by concluding that the defendant was impaired to such an extent that he could not conform his conduct to the requirements of law because of what he termed "over-controlled hostility." He stated that the psychiatric diagnosis which would conform most closely to his evaluation of the defendant's disorder was "emotional unstable personality."

The state also called two expert witnesses. James White, a psychologist, testified that he had examined the defendant and that he was of the opinion that the defendant was not suffering from mental disease or defect at the time of the events in question and was able to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. He stated that he was familiar with the term "over-controlled hostility" but that this represented a symptom of a certain type of personality, not a mental disease or defect.

Dr. Theodore Kiersch, a board-certified specialist in psychiatry, also examined the defendant on behalf of the prosecution. He testified that in his opinion the defendant was not suffering from any type of significant mental illness or disease or defect on the day of the offenses. Furthermore, even if the defendant were suffering to some extent from a mental illness, a possibility which Dr. Kiersch recognized, he was still of the opinion that the defendant was not impaired to the point where he could not conform his conduct to the requirements of the law. In his opinion, however, the defendant was not suffering from a mental illness or mental impairment. Dr. Kiersch stated that, in effect, his diagnosis was the same as Dr. Ludin's: that the defendant had a personality disorder. He testified that he was of the opinion that the defendant was not suffering from any form of temporary insanity at the time in question. Dr. Kiersch stated that over-controlled hostility is not a mental disease or defect. He referred to the defendant's "goal directed" behavior as an indication that the defendant knew what he was doing and was capable of conforming his conduct to the requirements of law.

■■ The first issue raised by the defendant on this appeal has been decided, adversely to his position, by our supreme court subsequent to the filing of the defendant's brief in this cause. In *People v. Massarella* (1978), 72 Ill. 2d 531, 382 N.E.2d 262, the court held that, absent objection by the state's attorney, the Attorney General may discharge all the powers of the state's attorney at all stages in a prosecution. Here, there is no indication of record of any objection on the part of the state's attorney to the Attorney General's office conducting the prosecution of the case. Therefore, the defendant's argument must be rejected.

We also reject the defendant's contention that the State failed to prove beyond a reasonable doubt that the defendant was legally sane at the time of the offenses of which he was convicted. As this court stated recently in *People v. Spears* (5th Dist. 1978), 63 Ill. App. 3d 510, 380 N.E.2d 423, this is a question of fact for the trier of fact, whose determination will not be disturbed unless it is manifestly against the weight of the evidence. The trier of fact must weigh the testimony and determine the credibility of the witnesses; the court sitting as trier of fact is not obliged to accept the opinion of any expert witness. *People v. Banks* (1st Dist. 1974), 17 Ill. App. 3d 746, 308 N.E.2d 261.

It is apparent that the court below accepted the opinion of Dr. Kiersch and rejected that of Dr. Ludin. We do not think that the court's determination could be considered to be manifestly against the weight of the evidence. Dr. Ludin's inability to identify any mental illness or disease from which the defendant was suffering detracted from the weight to be given to his testimony, as did the contradictions between his testimony at trial and the statements made in his written report. Dr. Kiersch's testimony, on the other hand, was clear and unequivocal.

■■ Further, testimony of lay witnesses suggesting that the defendant had planned his acts before he performed them and that he acted deliberately during the commission of the offenses could properly be considered by the trier of fact in reaching its determination that the defendant was criminally responsible for his conduct. As in the *Spears* case, the evidence here, especially with regard to the defendant's attempt to escape, indicated that the defendant both appreciated the criminality of his conduct and could conform his conduct to the requirements of law. We must affirm the trial court's finding that the defendant was criminally responsible for his actions.

Finally, we agree with the defendant that the court erred in entering a judgment of guilty on the charge of aggravated assault arising out of acts closely related to those forming the basis for the conviction of aggravated kidnaping. The two pertinent parts of the indictment read as follows:

"COUNT 13

On or about the 9th day of September, 1976, Jerald Roberts

committed the offense of aggravated kidnaping in that he did knowingly and secretly confine Susan Tucker against her will while armed with a dangerous weapon, namely a revolver, in violation of the Criminal Code of 1961, as amended, Section 10—2(a)(5) chapter 38, Illinois Revised Statutes.

COUNT 14

On or about the 9th day of September, 1976, Jerald Roberts committed the offense of aggravated assault in that he did, without lawful authority and by using a deadly weapon, a revolver, engage in conduct which placed Susan Tucker in reasonable apprehension of receiving a battery in that he did point said revolver at Susan Tucker and did hold it at her back forcing her to enter her car, in violation of the Criminal Code of 1961, as amended, Section 12—2(a)(1) chapter 38, Illinois Revised Statutes."

The defendant was sentenced to a term of 10 to 20 years imprisonment on the aggravated kidnaping offense and 364 days imprisonment on the aggravated assault offense.

In *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, the supreme court clarified when multiple convictions and concurrent sentences are permitted based on a series of interrelated acts. With respect to multiple acts, the court held, prejudice to the defendant results only where the defendant is convicted of more than one offense, some of which offenses are by definition lesser included offenses.

■■ We conclude that aggravated assault under section 12—2(a)(1) of the Criminal Code is a lesser-included offense of aggravated kidnaping under section 10—2(a)(5). The only element present in the latter offense which is not present in the former is secret confinement. It is impossible to commit the greater offense without necessarily committing the lesser offense. (See *People v. Delk* (5th Dist. 1976), 36 Ill. App. 3d 1027, 345 N.E.2d 197.) Therefore, the conviction of aggravated assault cannot stand.

For the foregoing reasons, the judgment of conviction of aggravated assault entered upon count 14 of the indictment and the sentence imposed thereon are reversed. In all other respects, the judgment and sentences of the Circuit Court of Crawford County are affirmed.

Affirmed in part and reversed in part.

MORAN, P. J., and KARNS, J., concur.