THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HUGHES WARE, Defendant-Appellant.

First District (5th Division)   No. 79-1280

Opinion filed August 29, 1980.

Lawrence Wolf Levin, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Christopher Cronson, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was convicted of murder and armed robbery and given concurrent sentences of 75 to 150 years for murder and 25 to 50 years for armed robbery. Defendant's sole contention on appeal is that his sanity at the time of the commission of these offenses was not proved beyond a reasonable doubt.

Michael Ellis, a State's witness, testified that on August 28, 1978, he was at his mother's home with defendant and others when he was asked by defendant to go with him to rob Charles Callahan, who lived a half-block away; that defendant and Ivory Joe Brown (one of the others present) then left, and he saw them knock on Callahan's door; that when Callahan came to the door, defendant and Brown pulled pistols from their belts and entered; that about five minutes later, defendant called him over and asked him to "stash" a television; that he took the television, placed it in the yard, and then walked across the street; that shortly after that, he heard about five gunshots and saw defendant and Brown exit Callahan's home and run down the alley; that when he returned to his mother's house, defendant and Brown were in the living room; and that defendant told him that "he had shot the old man four times" and gave him $12.50 for being a lookout. The witness further testified that he saw nothing unusual about defendant on the day of the shooting or at any time during the six years prior thereto that he had known defendant; and that defendant never mentioned hearing "voices or people talking to him that weren't there." On cross-examination, Ellis stated that he did not know defendant had been in a mental institution, and that during the four months prior to the shooting he had seen defendant two to three times a week.

Roy Washington, another of those at Mrs. Ellis' house with defendant, testified for the State that he heard defendant and Brown say that money could be obtained from Mr. Callahan; that he left to play baseball across the street from Callahan's home; that defendant and Brown came and asked him to watch for the police; that he saw Brown and defendant enter the Callahan home, after which he heard shots and saw defendant and Brown leave the home; that about 10 minutes later defendant and Brown walked up to him, and defendant indicated that they did what they set out to do; that he told defendant "you didn't have to snuff that guy" and they replied "like he knew me, he knew us"; that defendant gave him $12.50 for being on the corner; that he noticed nothing unusual about defendant that day; and that he did not know defendant had been in a mental institution.

Police investigator Bober testified that he arrested defendant on August 29 in his home, and that during the 10 to 20 minutes he was with

defendant he noticed nothing unusual about him. It was stipulated that bullet wounds to the back of the head caused the death of Charles Callahan.

Mrs. Ware, defendant's mother, testified that in the latter part of 1972, the commanding officer of defendant's army unit notified her that defendant had suffered a nervous breakdown and was hospitalized in Hawaii; that defendant was then transferred to a hospital at Fort Campbell, Kentucky, where he remained for six months; that he came home on weekend passes, and she noticed that he was very different from when he entered the army in that he would sit and stare quite often and also foam at the mouth; and that he would become ill if he did not take the thorazine which had been prescribed for him. Mrs. Ware further testified that from July 1973 to the day of the shooting, defendant was an outpatient at the VA Hospital in Chicago; that she accompanied him to this hospital for treatment; that thorazine and other medication was prescribed there for him, which she made sure he took every day—but she thought that he did not take it on the day of the shooting; that during July and August of 1973, defendant was withdrawn and often foamed at the mouth; that on August 28, 1973, Michael Ellis came to her home and asked her whether defendant could go out with him; that Ellis asked her permission because he knew defendant was a mental patient; that defendant and Ellis left, and when they returned that evening she noticed that defendant was acting strange in that he just stared and was foaming at the mouth; that defendant was arrested the next morning; and that when she tried to talk to him in jail, he was nonresponsive.

Dr. Kelleher, director of the Illinois Psychiatric Institute (a witness for defendant) testified that "the record shows that he was placed in the Cermak Hospital almost immediately after he was admitted to jail"; and the notes say that he was then "in an acute schizophrenic catatonic state"; that a schizophrenic is a person out of touch with reality and has a distortion of emotional responses; that in December 1973 Dr. Muchado of the Institute saw him in Cermak Hospital "where he was acutely psychotic"; that the Institute's next contact with him was around March 1, 1974, when he was examined by Dr. Malek; that he (Kelleher) personally examined defendant on four different occasions after Dr. Malek; that on one of his examinations, the diagnosis was schizo-affective schizophrenia, and paranoid schizophrenia on all other occasions; and that, in his opinion, defendant was insane at the time of the offense. The witness testified also that his conclusion of insanity was based on the following factors—(1) that he "had evidence that Mr. Ware had suffered a psychosis in military service" for which he was hospitalized five or six months in Hawaii and then for a month to six weeks in Kentucky before being released on July 3, 1973; that upon discharge, he was advised to go to the

VA Hospital in Chicago on an outpatient basis; (2) that during the 6-week period following his discharge from the service and his arrest, defendant's mother said he was noncommunicative and withdrawn; (3) that almost immediately after his arrest, he was hospitalized at Cermak Hospital, where he was diagnosed as having the same kind of psychosis he had in the service and was treated with psychotropic medication; and (4) that in December 1973, he was not improved when Dr. Muchado saw him and said he was an acute psychotic individual.

Dr. Kelleher also testified that defendant was committed to Chester Mental Hospital for almost a year, exhibiting the same symptoms; that in September 1974, his examination revealed that defendant was in a fair state of remission and restored, but his examination in April of 1975 revealed he was again acutely psychotic and he was recommitted. On cross-examination, Dr. Kelleher testified that his opinion of insanity at the time of the offense was reached in part because of his belief that defendant was insane while in the service (which information was given him by defendant and his mother); because he had been informed that after defendant left the service he was registered for outpatient treatment at the VA Hospital but did not go; and because his symptoms at the time of his service discharge still existed at the time of his arrest six weeks later when he was examined by other Institute doctors. Dr. Kelleher also testified that when a patient who shows schizophrenic symptoms takes psychotropic drugs, he should be brought back into "somewhat better contact with reality"; that very often a schizophrenic individual's condition worsens when he is incarcerated; and that if defendant had lied about symptoms or exaggerated them, his opinion would be changed.

In rebuttal, it was first stipulated that documents from the Cook County Department of Corrections, which were admitted into evidence, showed that defendant was initially examined at Cermak Hospital 2½ months after his arrest. Officer Darcy then testified that in the early morning hours of August 29, 1973, he saw defendant at police headquarters talking to other investigators; that defendant told investigators his name, address, date of birth, and other information and was responding normally to questions; that he again saw defendant in October 1973 in court, at which time nothing was noticeably unusual about him.

In surrebuttal, Dr. Kelleher said that while his opinion as to defendant's insanity at the time of the offense was based in part on his belief that a report from Cermak Hospital showed that defendant was in a catatonic state at the time of his arrest August 28-29, 1973, that he now knew of no documents indicating that defendant was admitted to Cermak Hospital prior to November 20, 1973; and that, nonetheless, even

if defendant had not been in Cermak Hospital immediately following the arrest, his opinion would not materially change.

OPINION

■■ We are concerned in this appeal only as to whether defendant's sanity at the time of the commission of the offenses was established beyond a reasonable doubt. By statute, "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1973, ch. 38, par. 6—2(a).) Once the accused has presented evidence raising a reasonable doubt as to sanity, as is the situation here, the burden shifts to the State to prove beyond a reasonable doubt that defendant possessed the requisite mental capacity at the time of the alleged offense. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321; *People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 385 N.E.2d 904.) However, the issue as to a defendant's mental condition at the time of an offense is one of fact (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171; *People v. Roberts* (1979), 71 Ill. App. 3d 124, 389 N.E.2d 596), and a trial court's finding of sanity will not be disturbed unless it is so manifestly contrary to the weight of the evidence as to indicate that the verdict was based on passion or prejudice (*People v. Rockamann* (1979), 79 Ill. App. 3d 575, 399 N.E.2d 162; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208). Furthermore, the court, as the trier of fact, is not obligated to accept the ultimate opinion of a psychiatrist (*People v. Varnado* (1978), 66 Ill. App. 3d 413, 384 N.E.2d 37; *People v. Young* (1978), 60 Ill. App. 3d 351, 376 N.E.2d 739), and may properly conclude that the defendant was sane at the time of the offense by accepting lay testimony over expert testimony (*Roberts*; *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388). Moreover, the weight to be afforded an expert's opinion is measured in part upon the facts which he marshalls in support of it. *People v. Romaine* (1979), 79 Ill. App. 3d 1089, 399 N.E.2d 319; *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.

Here, defendant relies primarily upon the opinion of Dr. Kelleher that he was suffering from paranoid schizophrenia which rendered him legally insane on the date of the offenses. We initially note, however, that Dr. Kelleher did not see defendant until several months after his arrest on August 29, 1973, and, as we view his testimony concerning his opinion of insanity at the time of the offenses on August 28, 1973, it appears to us that it was based upon four principal factors—(1) his belief that defendant was insane when discharged from the military service about six weeks

prior to the offenses, based on the symptoms outlined in the "Army report"[1] and information provided by defendant and his mother; (2) his belief that during this 6-week period, defendant did not receive the outpatient treatment at the VA Hospital; (3) his belief that Cermak Hospital records showed that immediately after defendant's arrest, he was diagnosed as being in an acute schizophrenic catatonic state; and (4) that this condition, which was the same as that he allegedly had in the service, continued to exist throughout his subsequent hospitalization.

Dr. Kelleher's opinion, however, was considerably weakened by other testimony because: as to factor one, most of the information concerning defendant's condition in the service was provided by defendant and his mother, and Dr. Kelleher admitted that when discharged from the service defendant had been diagnosed by the army doctors as having only a 10-percent disability; as to factor two, again while Dr. Kelleher said that defendant's mother told him he had not gone for outpatient treatment at the VA Hospital, defendant's mother testified at trial that he had been an outpatient at the VA Hospital, that she had accompanied him when he went to this hospital for treatment, and that medication was prescribed for him there—which she made sure he took every day; as to factor three, while Dr. Kelleher placed considerable reliance upon his understanding that the Cermak Hospital records on the day of defendant's arrest indicated that defendant was diagnosed as being in an acute schizophrenic catatonic state, it is a fact that defendant was not admitted to the Cermak Hospital until November 9, 1973, more than two months after the occurrence, and was first examined by an Institute doctor in December 1973; and, as to factor four, while Dr. Kelleher testified that the condition of plaintiff continued to exist, he also stated that with medication defendant should be brought back into "somewhat better contact with reality"; that he found at least one period of remission during his examinations, and that if defendant had lied about his symptoms or exaggerated them, his opinion as to sanity would be changed.

■■ While Dr. Kelleher also considered the statements of defendant's mother that during the times he was home on weekend passes from the army and during the six weeks after his discharge he appeared to be different from when he entered the army in that he would sit and stare, would foam at the mouth, and would become ill if he did not take the medicine prescribed for him at the VA Hospital, there was other testimony from which it appeared that defendant may have been in remission at the time of the offenses. His mother testified that he was an outpatient and was receiving medication until the day of the offenses, and both Ellis and Washington concluded, on the basis of their observations

---

[1] No such army report appears in the record.

prior to, during, and immediately after the shooting, that defendant acted normally. While defendant correctly points out that this testimony should be viewed with suspicion since both were accomplices (see *People v. Crane* (1976), 34 Ill. App. 3d 850, 341 N.E.2d 97), we note that their conclusions were corroborated by the arresting officer on the day of the offense, who stated that there was nothing unusual about defendant, and by another officer who observed him that same day as he was responding to questions, who testified that he answered in a normal manner.

■■ Thus, in finding defendant sane beyond a reasonable doubt, the trial court chose to accept the testimony of the State's lay witnesses over that of Dr. Kelleher. This was not improper (see *Varnado*; *Roberts*; *Kuhn*), and we are unable to say, from our review of the record, that the trial court's finding of sanity was contrary to the manifest weight of the evidence.

For the reasons stated, the judgment is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.