THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS J. DEIZMAN, Defendant-Appellant.

First District (3rd Division)　No. 63044

Opinion filed December 16, 1976.

David P. Schippers and John W. Long, both of Chicago (Schippers, Betar, Lamendella & O'Brien, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Renee G. Goldfarb, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Thomas Deizman, was indicted for the murder of Thomas Schmidt. He was found guilty of that charge after a trial without a jury. Subsequent to that finding, the trial court granted in part defendant's motion for a new trial and entered a judgment of guilty of voluntary manslaughter. Defendant was sentenced to five to 20 years. The sole issue on appeal is whether the State proved beyond a reasonable doubt that defendant was sane at the time of the commission of the offense.

For 15 years prior to the occurrence, defendant was a teacher and athletic coach at a high school in Cook County. His attendance at school was regular up to and including the last day of the school year, two days before the shooting. Over the preceding two years defendant had formed a close relationship with the decedent, one of his students. Defendant's wife characterized the relationship as father-son and testified that defendant maintained a deep and constant interest in helping decedent.

At approximately 8:30 p.m. on June 16, 1974, defendant went to a lounge in the city of Berwyn where decedent was employed as a cook. At the bar defendant had a number of drinks and spoke with the bartender. The bartender testified that he noticed nothing unusual about defendant and their conversation was nothing out of the ordinary. After about 30 minutes, defendant went to the kitchen to speak to decedent. Defendant followed decedent around the establishment, leaving the bar several times. When decedent went to the basement to obtain supplies, defendant followed him. The pair were in the basement for about 30 minutes.

Upon their return, the bartender heard them conversing animatedly. Although the bartender could not hear the words, he believed that defendant and decedent were arguing. Decedent went to the foyer to make a telephone call. Defendant followed, and the bartender was able to see them through a window. As decedent attempted to place the call, defendant struck him on the head with his hand. The bartender heard five shots, and entering the foyer, saw decedent lying on the floor.

Sometime later, defendant called his wife. He asked whether Schmidt was dead and she informed defendant that he was. About an hour later, defendant again called his wife and told her he was leaving town and

needed money. Defendant directed his wife to go to a neighbor's home where he could call her since he was afraid that their home telephone was tapped. She complied with the instructions and received another call from defendant at the neighbor's home. Defendant told his wife the name of the motel and gave the room number where he was staying. He asked her to come and help him and to bring money since otherwise he would kill himself. Defendant's wife informed the police of these events because she wanted her husband found before he came to any harm.

Officer Warren Trucksa of the Berwyn Police Department testified that at 4 a.m. on June 17, after speaking to defendant's wife, he and the other officers went to a motel located in Chicago. They asked the night clerk if a Thomas Deizman was registered in Room 25. The officers were informed that the room was occupied by a Tommie Werd, who had a New York address. Upon being shown a photograph of defendant, the clerk identified him as the man occupying Room 25.

Receiving no answer to his knock, Trucksa used the pass key to enter the room. Defendant was asleep on the bed. The officers awakened him and told him he was under arrest. When asked if he knew the reason for his arrest, defendant replied that he did. Defendant stated that he did not have a gun in the room. Trucksa testified that defendant's responses seemed normal and his speech was not slurred. Detective Edward Pabst testified that he did not notice anything unusual about defendant's condition at the time of the arrest and that defendant's eyes appeared normal.

On the way to the police station, defendant told the officers that his automobile was parked in the vicinity of the lounge and that he had discarded the gun in a garbage can. When asked the location of the garbage can, defendant said that there was no need to worry about the gun being used or harming anyone. The gun subsequently was recovered in Oak Park. The gun was registered to defendant and the clip had been removed. Five spent cartridges previously recovered had been fired from defendant's gun.

Defendant's wife testified that defendant began to drink heavily in February 1974. He voluntarily entered a hospital for his alcoholism. He told his wife that two days after his admission he escaped by tying sheets together and leaving through a second floor window. She testified that defendant's drinking increased, and defendant became obsessed with helping decedent. Defendant would drink all night long and then go to work in the morning without having been to bed. He had no interest in his family and did not know what his children were doing. He continued to drink and babble about nonsensical ideas. She also testified that he had been a very conservative person in both dress and spending habits. However, he began to spend money without caring about the amount. He

also began to wear mod clothes and to let his hair grow longer. After school ended on June 14, he began drinking around the clock.

Defendant's wife testified further that defendant and decedent had planned a camping trip for the summer. Defendant told his wife that decedent seemed reluctant to go on the trip and defendant expressed anger at this reluctance. On June 15, the day before the shooting, defendant left home with a gun to look for decedent. He told his wife he just wanted to talk to decedent. Prior to that time, she had heard defendant threaten to kill decedent on several occasions. She also heard him threaten to take his own life.

Defendant called three psychiatrists to testify as to his mental condition at the time he shot decedent. Dr. Jan Fawcett examined defendant on June 25 and July 5, 1974. On June 25, defendant appeared confused. He was hallucinating small animals, picking at his clothes and unable to carry on a conversation. During the second examination, defendant conversed in a logical manner, but his affect was inappropriate. Based upon defendant's speech and his version of the occurrence, personal histories supplied by defendant's relatives, and hospital records, Dr. Fawcett believed that at the time he shot decedent, defendant thought he was under attack and did not appreciate the criminality of his act. On cross-examination, the doctor testified that he stated in his report that defendant suffered from alcoholic hallucinosis. The chronic form of schizophrenia which he believed defendant was suffering was brought on by defendant's drinking.

Dr. Robert Reifman examined defendant on September 12, 1974, and March 4, 1975. He testified that in September defendant was on medication which would disguise his psychosis. Dr. Reifman diagnosed defendant as a schizophrenic suffering from mood swings. While Dr. Reifman doubted that defendant possessed the substantial capacity to appreciate the criminality of his act, he admitted he was uncertain.

Dr. Paul Cherian saw defendant approximately twice a week during the period of June 17 to October 23, 1974. The doctor diagnosed defendant as a schizo-affective schizophrenic with homosexual tendencies. He testified that the psychosis was steered off by the alcohol which causes such an individual to behave abnormally. Dr. Cherian based his diagnosis on his own observations of defendant and statements made to him by defendant. The doctor was unable to make a definite diagnosis of defendant's condition on the day of the shooting.

Dr. Werner Tuteur testified for the State as an expert witness. He examined defendant for one hour on May 24, 1975. On that day he administered various psychiatric tests. On the basis of the tests and the interview of defendant, the doctor determined that at the time of the examination defendant was not suffering from any mental disease or

defect. He further testified that defendant's own statements indicated that on the day of the shooting defendant did not suffer from a mental disease or defect as described in the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 6—2). Dr. Tuteur had not examined defendant's case history and had not talked to defendant's relatives. He was unaware that defendant was under any medication at the time he examined him. The doctor agreed that certain medication would alleviate symptoms of an existing psychosis.

The State also called as a rebuttal witness Mr. Donald F. Ciner, the assistant principal at the school where defendant taught. Ciner testified that from 1961 until about three years prior to the shooting he saw defendant infrequently. During the three years prior to the offense, Ciner saw defendant two or three times a week. Occasionally, they would converse. Ciner testified that throughout the years he knew defendant he noticed no change in defendant's personality, style of dress, standard of cleanliness, or hair style. Defendant had never been unruly in any way. During the 12-month period prior to the shooting, defendant had complied with school requests concerning his responsibilities as a teacher. Based upon observations of defendant, his appearance and conversations, Ciner expressed an opinion that defendant possessed substantial capacity to appreciate the criminality of his acts and conform his conduct to the requirements of the law.

■■ Defendant contends that the State failed to meet its burden of proof on the issue of sanity. All men are presumed sane unless the evidence adduced at trial raises a reasonable doubt of sanity at the time of the commission of the crime. (*People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321.) Since the evidence adduced at trial overcame the presumption of defendant's sanity, the burden fell upon the prosecution to prove defendant's sanity as an element of the crime charged. The question of defendant's mental condition at the time he shot decedent was one of fact to be determined by the trial court along with the other factual issues of the case. *People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.

■■ It was the trial court's duty to decide, on the basis of all the evidence adduced, whether the State satisfied its burden. (*People v. Horton* (1975), 29 Ill. App. 3d 704, 331 N.E.2d 104.) The trial court's finding of sanity may not be disturbed unless it is so palpably erroneous as to indicate that it was based upon prejudice or passion. (*People v. Banks* (1974), 17 Ill. App. 3d 746, 308 N.E.2d 261.) In our view, the trial court in the present case correctly determined that defendant was sane at the time he killed decedent.

■■ Defendant maintains that the testimony presented by the three psychiatrists called on his behalf destroyed the presumption of sanity, and that the testimony of the State's expert witness, Dr. Tuteur, was

insufficient to sustain the State's burden of proof. There is no requirement that the State present expert medical testimony when confronted with the issue of sanity. (*People v. Horton.*) Moreover, the trial judge was not obliged, as a matter of law, to accept the opinions of the psychiatrists proffered by defendant. (*People v. Sims* (1976), 35 Ill. App. 3d 401, 342 N.E.2d 256; *People v. Banks.*) Of the three experts called by the defendant, no two concurred in their diagnosis of defendant. Only Dr. Fawcett stated with certainty that he believed defendant lacked substantial capacity to appreciate the criminality of his act. The other two doctors doubted that defendant comprehended the criminality of his act, but each admitted that he could not state so conclusively. Thus, the testimony upon which defendant relies is at best equivocal.

More importantly, defendant's conduct, both prior to and particularly subsequent to the shooting, conclusively reveals an awareness on his part of the criminality of the acts. We already have set forth that conduct in some detail. We merely reiterate that, after shooting decedent, defendant abandoned his vehicle. He threw his gun in a garbage can after removing the clip from the gun. He registered in a motel under an assumed name. He contacted his wife to learn if Schmidt were dead, and to obtain money to flee the city. When arrested, he appeared normal and told the officers he knew why he was being arrested. Such conduct manifests that throughout the entire evening in question defendant possessed the substantial capacity to appreciate the criminality of his acts.

Defendant places great emphasis upon the testimony of defendant's wife to establish a marked change in defendant's mental condition. However, the assistant principal's testimony was more than sufficient to rebut the claims of defendant's wife that, prior to the shooting, defendant was behaving in an erratic and obsessive manner. Ciner testified unequivocally that he did not notice any change in defendant's dress, hair style, or behavior. Defendant also had complied with all school requirements concerning his duties as a teacher.

■■ Defendant also argues that the failure of the State to call Officers Trucksa and Pabst to give testimony on the issues of defendant's sanity gives rise to an inference that their testimony would have been favorable to defendant. In order to sustain its burden, the State was not required to produce additional evidence to rebut that presented by defendant. (However, the State did present the rebuttal testimony of the doctor and the assistant principal.) It was proper for the State to rely upon facts already in evidence and the inferences to be drawn from those facts. (*People v. Lono* (1973), 11 Ill. App. 3d 443, 297 N.E.2d 349.) The officers already had testified for the State in its case in chief. Their testimony established that defendant's responses to questions were coherent, his eyes appeared normal, and his speech was not slurred. It was not

necessary for the State to recall these officers for the sole purpose of having them express an opinion that defendant was sane at the time they arrested him. We conclude that the State proved beyond a reasonable doubt that defendant was sane at the time he committed the offense.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

MEJDA, P. J., and McGLOON, J., concur.