THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PAUL D. BOUCHARD, Defendant-Appellant.

Second District   No. 2—87—0554

Opinion filed February 28, 1989.—Rehearing denied April 7, 1989.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Paul Bouchard, was charged by information with one count of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) for intentionally and knowingly causing the death of Kimberly Shattuck without lawful justification. Following a bench trial, defendant was found guilty but mentally ill of the crime of murder and was sentenced to 20 years' imprisonment. Defendant's post-trial motion was denied, and this appeal followed. We affirm.

Defendant raises the following issues on appeal: (1) whether the Illinois statute requiring defendant to prove the defense of insanity by a preponderance of the evidence is an unconstitutional shifting of the burden of proof; and (2) whether the trial court erred in holding that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense.

On September 3, 1986, at approximately 6 p.m., Jesse Shattuck found the body of his wife, Kimberly Shattuck, on the bedroom floor.

It was determined that she died as a result of hemorrhage in association with the 55 stab wounds she had received. The police arrived and found no evidence of burglary or ransacking of the Shattuck home. Around 8 p.m., two police officers visited defendant's home after learning that defendant had been to the victim's home earlier in the day. Defendant agreed to accompany the police officers to the police station for an interview. After receiving and waiving his *Miranda* rights, defendant told the police officers that he visited the Shattuck home around 5:40 p.m., looking for the victim's stepdaughter Tracy. He stated that no one was home and that he continued his walk to a local grocery store where he was employed. He arrived at the store at 6 p.m., where he saw Tracy Shattuck, also an employee. He told Tracy that he had a stomachache and would not be able to work that evening. Defendant then went home.

On September 4, 1986, the police received a call from Barbara McFarlane, an employee at a store located across the street from where defendant was employed. McFarlane told the police that she was working the previous afternoon and saw defendant in an alley around 5:30 p.m. Defendant approached McFarlane and requested a towel to wipe the blood from his arms and hands. Defendant stated that he had fallen down but was not hurt. The following morning, McFarlane discovered clothing in the washroom where defendant had cleaned himself. This clothing was later identified as belonging to defendant. A 12-inch-long knife was also recovered in the washroom. An arrest and search warrant was executed, and defendant was brought into custody on the evening of September 4. Items seized pursuant to the warrant and turned over to police by McFarlane were found to have traces of blood and hair incriminating the defendant.

Several classmates of defendant at Rockford East High School testified at trial. They testified that defendant was not known to ever use alcohol, tobacco, or illegal drugs. They did not notice anything unusual or bizarre about defendant's behavior on the day of the murder. However, nearly all of the witnesses stated that defendant was known to tell very unusual and often exaggerated stories. At various times defendant was known to claim that he was from Canada and moved to the United States to have a better chance of making the Olympic wrestling team. He often told stories about the number of automobiles and motorcycles he owned, and how he had personally built a three-car garage for his auto repair business.

Defendant also told numerous exaggerated stories and lies about his father. At various times he stated that his father was a Vietnam veteran and that he had served in the Canadian Air Force. He noted

that his father was an Olympic-class wrestler who would have received an Olympic medal had not a stove blown up and broke his father's back. He also stated that his father was an alcoholic and smoked a lot of marijuana.

None of the acquaintances testified that defendant was a violent person. However, defendant often told stories relating to the subject of death. He told classmates that he once killed a "mental person" in Chicago and placed him in a trash dumpster. He also told them that he had once been in a car crash in which a friend was killed. Defendant once asked two classmates how they would kill someone if they had the opportunity to do so. Defendant told them that he was going to kill "a fat lady, a girl that was a bitch and her father" in order to get a car to drive. The two students thought he was kidding and laughed at him, after which defendant then stated that he was kidding.

Defendant's father, Terry Bouchard, also testified at trial. He stated that defendant had a normal childhood and was not known to use any type of drugs. He agreed that defendant was frequently known to exaggerate and tell unusual stories. He also noted that he never served in Vietnam or in the Canadian Air Force and that he was never an Olympic-class wrestler. Furthermore, defendant never owned a car or motorcycle, nor did he operate an auto repair business. He also stated that defendant never lived in Canada nor was he involved in any killings or fatal automobile accidents.

Two expert witnesses testified for the defendant. Dr. Frank Cushing, a clinical psychologist, diagnosed defendant's mental condition as "a paranoid schizophrenic break *** and also suffers from a borderline personality disorder." Dr. Cushing described a borderline personality disorder as falling in between neuroses (mild disorders) and psychoses (major disorders) and claimed it was "the gateway to insanity." It was the doctor's opinion that defendant's pattern of "intense emotional ups and downs," coupled with a history of unstable relationships, was characteristic of a person suffering from a borderline personality disorder. Dr. Cushing later described the characteristics associated with schizophrenia as a loss of touch with reality and delusions, hallucinations, and perception disorders.

It was the opinion of Dr. Cushing that defendant suffered from schizophrenia and borderline personality disorder on September 3, 1986. The doctor stated that this condition would prevent defendant from having the capacity to appreciate the criminality of his conduct. Dr. Cushing also stated that there was no evidence during any of the interviews that defendant was faking mental illness. In fact, defend-

ant would often fight the notion that there was anything wrong with him.

Dr. Cushing interviewed defendant several times, including once when defendant was under the influence of a sodium amytal injection. Dr. Cushing stated that sodium amytal (a barbiturate) is used to slow down a patient's defense system to allow for more spontaneous responses to questions. After receiving the injection, defendant did not try to protect the fact that there may have been something mentally wrong with him. Defendant told Dr. Cushing that he wanted to kill Mrs. Shattuck to gain possession of her car, but he did not actually take the car because he did not want to steal it. Defendant also stated that he killed Mrs. Shattuck because she was fat and "little people" told him to do it. He also expressed an extreme hostility towards his father, claiming that he killed Mrs. Shattuck because he wanted his father to suffer in knowing that his son was a murderer. He also talked about strong urges towards killing his father.

On cross-examination, Dr. Cushing testified that defendant may have known the gravity of the act he had committed when he changed his clothes and disposed of the murder weapon shortly after he committed the crime. He also agreed that defendant may have tried to "cover himself" when he visited the victim's stepdaughter at work shortly after the murder was committed. It was also Dr. Cushing's opinion that defendant was trying to cover for something he knew was wrong when he was "shocked and surprised" when he found out that Mrs. Shattuck had been murdered.

Dr. Anthony D'Souza, a psychiatrist, also testified as to defendant's mental state at the time of the offense. It was Dr. D'Souza's opinion that defendant was suffering from a paranoid schizophrenia condition along with having a dissociative disorder. The doctor described a dissociative disorder as a condition in which certain aspects of a person's mental functioning are removed from the rest of the person's mental functioning. It was Dr. D'Souza's opinion that defendant had an irresistible urge to kill someone, although he did not know whom he actually wanted to kill. The doctor noted that certain aspects of defendant's mind disintegrated from the rest of his mind, as a result of extreme stress or anger, such that defendant did not know he was stabbing the victim. It was only after defendant finished stabbing the victim that he knew he had done something wrong.

Dr. D'Souza also noted that defendant had experienced auditory hallucinations at the time of the homicide. It was his opinion that the motive for the crime was defendant's intense anger with his father. He further added that defendant did not know right from wrong and

that based on all of the patients he had seen, defendant was "one of the most severely schizophrenic people I have ever seen."

On cross-examination, Dr. D'Souza acknowledged that persons in a psychotic state can know right from wrong. He indicated that the probability that defendant could do so was "extremely low." He also stated that the fact that defendant brought a change of clothing with him to the crime may be indicative that defendant knew what he was doing was wrong.

The State also presented two expert witnesses to testify as to defendant's mental condition at the time of the offense. Dr. Lawrence Berley, a psychiatrist, testified that defendant did not suffer from schizophrenia. Instead, it was the doctor's opinion that defendant suffered from narcissistic and compulsive identity disorder, conduct disorder, malingering, factitious disorder, and post-traumatic stress disorder. Dr. Berley noted that these five personality disorders would impair defendant's judgment at the time he committed the crime. However, he stated that defendant could appreciate the criminality of his conduct and did possess the capacity to conform his conduct to the law at the time of the offense.

Dr. Berley testified, on cross-examination, that defendant told him that Mrs. Shattuck resembled defendant's father in terms of her gestures and laughter. Defendant also told him that he picked Mrs. Shattuck because she was more vulnerable than was his father. It was Dr. Berley's opinion that defendant had an eventual goal of killing his father in mind. The doctor noted that defendant's motive for the killing appeared to be a displaced revenge for his father's abusive humiliation of him.

The State's other expert witness, Dr. Donald Pearson, a clinical psychologist, testified that he found no evidence that defendant was suffering from schizophrenia. He further stated that defendant was not suffering from any mental disease or defect at the time of the homicide. It was his opinion that defendant had the capacity to understand the criminality of his conduct and also the ability to conform his conduct to the requirements of the law.

On cross-examination, Dr. Pearson testified that it was his assumption that defendant's conduct was sufficiently outrageous as to suggest some type of chemical involvement. Specifically, the doctor believed that blood and urine tests would discover the presence of some mind-altering substance, possibly PCP (Phencyclidine). However, no blood or urine tests were administered to defendant after he was arrested for the crime. It was Dr. Pearson's opinion that something had to cause defendant's unexplainable conduct.

Following the final arguments of the parties, the trial court determined that defendant failed to meet his burden on the insanity issue and found defendant guilty but mentally ill of murder. The court concluded that defendant was not legally insane at the time of the commission of the offense.

Defendant first contends that his conviction should be reversed because he was tried under an unconstitutional legal standard. Defendant argues that the State has the burden of proving the defendant's capacity to formulate the *mens rea* necessary to commit the offense. Thus, defendant concludes that to require defendant to prove his insanity by a preponderance of the evidence is a violation of the fifth and fourteenth amendments to our constitution. Defendant concedes that this argument was not raised in the court below, but requests us to consider it on appeal under the plain error doctrine.

■ It is well established that to preserve an error for review a defendant must object to the error at trial and raise it with specificity in a post-trial motion for a new trial. (*People v. Caballero* (1984), 102 Ill. 2d 23, 31, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. Greene* (1987), 160 Ill. App. 3d 1089, 1094, 513 N.E.2d 1092.) The failure to do so constitutes a waiver of that issue, and it cannot be utilized as a ground for reversal on appeal. *People v. Johnson* (1987), 119 Ill. 2d 119, 131, 518 N.E.2d 100.

■ There is, however, an exception to the general rule of waiver when there has been "plain error." Supreme Court Rule 615(a) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (107 Ill. 2d R. 615(a).) This rule is not a general savings clause preserving all errors affecting substantial rights. (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227.) Instead, it must be plainly apparent from a review of the record that the alleged error affected substantial rights of the defendant. *Precup*, 73 Ill. 2d at 17.

■ Several recent decisions have considered the constitutionality of section 6—2(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e)). In *People v. McDarrah* (1988), 175 Ill. App. 3d 284, 529 N.E.2d 808, we specifically held this section to be constitutional. In addition, both the Appellate Court for the First District (*People v. Martin* (1988), 166 Ill. App. 3d 428, 519 N.E.2d 1085) and the Fifth District (*People v. Hightower* (1988), 172 Ill. App. 3d 678, 526 N.E.2d 1129) have held the statute to be constitutional. Thus, no substantial rights are being affected which may require application of the rule, and we therefore decline to apply the rule.

Defendant next contends that he met his burden of proving insanity by a preponderance of the evidence. He claims that the trial court's ruling that defendant was sane at the time of the offense was against the manifest weight of the evidence. Defendant concedes that the question of sanity is one of fact, and the decision of the trier of fact will not be reversed unless the decision is so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's sanity. *People v. Eckhardt* (1987), 156 Ill. App. 3d 1077, 1090, 509 N.E.2d 1361; *People v. Snowden* (1986), 147 Ill. App. 3d 763, 770, 498 N.E.2d 612.

Defendant contends that the trial court could not have believed the State's expert witnesses because the testimony was "internally contradictory, conclusory, and tentative" such that the testimony was not credible. Defendant cites *People v. Palmer* (1985), 139 Ill. App. 3d 966, 487 N.E.2d 1154, for the proposition that a witness must be credible before rendering an opinion as to sanity. In *Palmer*, the defendant was found guilty but mentally ill of committing murder. All defense witnesses, both lay and experts, agreed that defendant possessed a severe mental illness. The treating physicians believed he was suffering from schizophrenia and that he could not conform his conduct to the requirements of the law at the time of the offense. The State's only expert based his opinion on defendant's drug use, but added that schizophrenia would produce similar symptoms. The appellate court reversed defendant's conviction, holding that there was a reasonable doubt as to defendant's sanity at the time of the offense. (*Palmer*, 139 Ill. App. 3d at 974.) The court noted that there was no real evidentiary conflict for the trier of fact to resolve, especially considering that the State's expert witness agreed that the defendant was "grossly psychotic" at the time of the offense. (139 Ill. App. 3d at 973.) Defendant contends that his conviction should also be overturned because, like *Palmer*, there was no real evidentiary conflict for the trier of fact to resolve.

We find the facts and expert opinions in this case to be very different from those present in *Palmer*. In *Palmer*, the defendant had a long history of mental illness and in fact had been previously hospitalized and diagnosed as suffering from schizophrenia. (139 Ill. App. 3d at 968-70.) There was no evidence that the *Palmer* defendant planned the crime or attempted to conceal the crime from the police. (139 Ill. App. 3d at 967.) In addition, the State's witness was not credible, and all lay witnesses corroborated the defendant's experts as to defendant's insanity. 139 Ill. App. 3d at 973.

Here, unlike *Palmer*, there was no evidence of any prior mental illness of defendant Bouchard. All of defendant's teachers, fellow stu-

dents, and neighbors who testified at trial stated that he was like any other "normal" teenager. Outside of the fact that defendant was known to frequently exaggerate, none of the witnesses had anything negative to say about defendant's mental stability.

In addition, we find support in the record to substantiate the State's contention that defendant had planned the offense and had attempted to conceal evidence of the crime from the police. On the day before the killing, defendant told two classmates that he was going to kill someone to get a car. He even asked a fellow student to assist him in killing someone by requesting the student hold the victim down so defendant could stab the person with a knife or an axe. This request was refused. Furthermore, defendant asked another student what the best method is for killing someone. The evidence clearly warrants the conclusion that defendant had known, at least for one day, that he was going to kill someone.

There is also evidence to suggest that defendant attempted to conceal his involvement in the crime from the police. Defendant spoke with the victim's stepdaughter, Tracy Shattuck, about one-half hour after the homicide. He told her that he had been over to her house but that there was no one home. He told the police the same story, apparently in an effort to provide an excuse for himself if anyone had happened to see him at the house. Defendant also tried to hide the murder weapon and his bloodstained clothing in a garbage can a short distance from the Shattuck home. Defendant immediately took a shower when he returned home after committing the crime, apparently to wash the blood from his body.

■ The existence of a plan for a crime, and methods to prevent detection, are relevant factors in determining a defendant's sanity. (*People v. Skorka* (1986), 147 Ill. App. 3d 976, 982, 498 N.E.2d 607; *People v. Teague* (1982), 108 Ill. App. 3d 891, 903, 439 N.E.2d 1066, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206.) In *Skorka*, the court held that the fact that defendant attempted to hide the murder weapon was an indication that he was attempting to avoid punishment for the crime. He was thus aware of the wrongfulness of the act such that he was not insane at the time of the commission of the crime. (*Skorka*, 147 Ill. App. 3d at 982.) The defendant in *Teague* also tried to conceal a weapon after committing two armed robberies. The court reasoned that defendant's attempt to avoid detection was indicative that defendant knew what he had done was wrong. Thus, the court concluded that the totality of the evidence presented supported the finding that defendant was sane at the time of the offense. (*Teague*, 108 Ill. App. 3d at 904.) We also find the evi-

dence of a plan and an attempt to conceal evidence of the crime as supporting the trial court's determination that Paul Bouchard was sane at the time of the offense.

■ In addition, we find defendant's contention that the State's witnesses were not credible to be unpersuasive. Defendant correctly points out that the expert testimony was conflicting in this case. Each of defendant's experts testified that defendant was suffering from schizophrenia or a similar mental disease at the time of the offense such that he could not appreciate the criminality of his conduct. Each of the State's experts testified that defendant was sane at the time of the offense. It is within the sound discretion of the trial court to resolve all contradictions in the expert testimony presented to it. *Martin*, 166 Ill. App. 3d at 435; *Eckhardt*, 156 Ill. App. 3d at 1095.

The record indicates that both of the State's experts performed various psychological tests on defendant, none of which indicated defendant was suffering from schizophrenia. Dr. Pearson determined that defendant was sane at the time of the offense, although he deferred making a diagnosis because defendant refused to answer certain questions during the interview. Defendant contends that Dr. Pearson's failure to come to a diagnosis is a result of an incomplete assessment of defendant's mental stability. Defendant also asserts that Dr. Pearson's conclusion that drugs or alcohol may have contributed to defendant's outrageous conduct renders Dr. Pearson's testimony invalid because there was no evidence to suggest defendant ever used any drugs. We agree that the record clearly indicates defendant was not known to use any type of illegal drug or alcohol at any time in his life. However, we are not willing to conclude that because Dr. Pearson suggested the possibility of chemical involvement, his entire opinion regarding defendant's sanity is unreliable.

■ ■ The trier of fact is allowed to accept a part of any expert's testimony and reject other parts of the testimony. (*Eckhardt*, 156 Ill. App. 3d at 1096; *People v. Grice* (1984), 121 Ill. App. 3d 567, 569, 459 N.E.2d 1122.) The trial judge could very easily have discounted any of Dr. Pearson's opinions regarding the possibility of chemical involvement, while at the same time finding the doctor's opinions concerning the interpretation of the psychological test data to be persuasive. We do not find Dr. Pearson's testimony to be incomplete, as defendant suggests, and find ample support in the record to support his opinion that defendant was sane when he committed the homicide.

■ In addition, the State presented numerous lay witnesses to testify as to defendant's mental condition. Lay opinions are admissible on the issue of defendant's sanity at the time of the offense if they

are based on observations made shortly before or after the crime was committed. (*People v. Gindorf* (1987), 159 Ill. App. 3d 647, 660, 512 N.E. 2d 770, *cert. denied* (1988), 486 U.S. 1011, 100 L. Ed. 2d 206, 108 S. Ct. 1743; *People v. Chatman* (1986), 145 Ill. App. 3d 648, 659, 495 N.E.2d 1067.) The testimony of numerous students who went to high school with defendant indicated that there was nothing unusual about his manner of speech or appearance on both the day of the crime and the previous day. We find such lay testimony to be based on personal observations close enough in time to the offense to be admissible in this case. Furthermore, the lay witness testimony supports the State's expert opinions that defendant was sane at the time of the crime.

█ █ In deciding questions of sanity, the trier of fact may accept one expert's opinion over another. (*Chatman*, 145 Ill. App. 3d at 659; *People v. Schwartz* (1985), 135 Ill. App. 3d 629, 642, 482 N.E.2d 104.) In addition, the fact finder may reject all expert testimony and rely solely on lay testimony to conclude defendant was sane. (*Palmer*, 139 Ill. App. 3d at 974.) Here, the trier of fact was presented with a conflict of the evidence as to whether defendant was sane. The court resolved this conflict in favor of finding defendant sane at the time of the offense. This decision is amply supported by the testimony of two expert witnesses and a number of lay witnesses. We find the record supports the decision of the trial court that defendant did not meet his burden of proving insanity by a preponderance of the evidence.

For the reasons stated above, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

LINDBERG and WOODWARD, JJ., concur.