THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GEORGE WILLIAMS, Defendant-Appellant.

First District (6th Division) No. 1—87—2096

Opinion filed June 29, 1990.

Randolph N. Stone, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of the murder and aggravated criminal sexual assault of two 76-year-old women. The trial court sentenced defendant to a term of imprisonment for life. On appeal, defendant contends that he sustained his burden of establishing his insanity by a preponderance of the evidence; that he was denied a fair trial due to comments made by the court; that the jury instructions on the verdict of guilty but mentally ill misstated the law; and that the court erred in excusing for cause all potential jurors who opposed the death penalty.

Because defendant does not challenge the jury's finding that he did in fact commit the crimes, we will summarize the evidence.

On July 12, 1984, defendant killed 76-year-old Dorothea Smith by strangling her with a nylon stocking and stabbing her in the chest, after beating her and forcing her to perform fellatio. Later that day, defendant killed 76-year-old Josephine McMullen. He first vaginally raped the victim, then tied her to a chair, and strangled her with a nylon stocking.

On July 20, 1984, defendant was arrested and charged with the murder and aggravated criminal sexual assault of each of the victims.

At trial, the state presented certain physical and forensic evidence which connected defendant to both crime scenes. It also offered evidence detailing the discovery of the bodies; the condition of the crime scenes; and defendant's actions following the murders, when he fled to Indiana, California, Utah, and Nebraska.

Officer Thomas Ptak testified for the State that on July 20, 1984, he questioned defendant about the two homicides. At first, defendant denied committing the crimes, but then admitted he had killed the victims. Defendant said he had been under a lot of pressure and stress lately due to financial and sexual problems.

James Linn, an assistant State's Attorney, testified for the State that on July 20, 1984, he interviewed defendant. Defendant's confession was taken down by a court reporter. When the 17-page statement was transcribed, defendant went over it and made corrections.

In the confession, defendant stated that on July 12, 1984, he was

at a tavern in Chicago in the morning. After leaving the tavern, he went to Smith's home. Defendant knew Smith through his wife and had been to her home five or six times.

Defendant described the first killing and sexual assault. After leaving Smith's home, defendant went home and changed clothes, and then went to his sister's home. From there, he went to his bank and withdrew $2,000 using a credit card. He felt he would need money because he would be on the road, trying to evade the police.

Defendant then drove his car to the home of McMullen, for whom he had done handy work. After describing the crime, he stated that he had taken a ring from the victim's finger.

Defendant left the McMullen house, driving her car, and drove to Indianapolis, where he left the car. He then bought a bus ticket to Los Angeles and checked into a hotel under the name of George Gray. The next day he took a bus to Salt Lake City, and then took a bus to Omaha, Nebraska, where he spent the night in a hotel, registered under his own name. He then returned to Chicago. He arrived at his sister's home on July 19 and slept in her backyard. The next morning he saw his sister and was arrested. Previously he had telephoned his sister several times. He did not tell her where he was because he was still trying to avoid the police.

Judy Williams, defendant's sister, testified for the State regarding numerous telephone calls which defendant made to her prior to, and during the week following, the murders. As the calls took place, Judy reported them to the police. The first call was a message on her answering machine. On July 12, 1984, at 11:30 a.m., she heard the message when she arrived home. Defendant stated, "I called to tell the family to forgive me but I have to hurt somebody and kill myself."

Just then, defendant called again. He repeated his statement and mentioned he was in a tavern. He was talking in a normal conversational tone. He did not appear intoxicated, although he might have been drinking a little. He called back later and said he was at a tavern at 70th and Western. His voice was still normal. He said that "voices were telling him he had to hurt somebody. He also said he had to rape somebody and kill himself." A neighbor, Peggy Moore, spoke with defendant while Judy went next door to call the police.

Just after 2 p.m., defendant telephoned again. He was upset because Judy had telephoned the police. The police had come to the tavern, but the bartender, a friend, lied and said defendant was not there. Judy testified that defendant did not sound intoxicated.

Defendant telephoned Judy later. He wanted to meet with Judy. He said, however, that the voices were still talking to him and that he

would rape and kill her.

At 4:40 p.m., defendant came to Judy's home. He told her that he had killed an older woman. While they were talking, "he was just kind of trying to dance back and forth, walking back and forth to the car and back to where we were talking." He was not crying or yelling, or acting unusual. She smelled no alcohol. He warned her not to call the police, and said within 15 minutes he was getting rid of his car.

At this point, Peggy Moore walked up with her husband, George Moore, a Chicago police officer. Judy introduced him to George. Within a few minutes, defendant left in his car. During the visit, he had not complained of voices or mentioned any pains in his body or head. He was coherent, had no problem walking or speaking, and his answers were responsive to her questions. Later that evening, at defendant's home, Judy and Carol, defendant's wife, found some of defendant's clothes and some towels, which had blood on them. They gave the items to the police.

On Sunday, July 15, defendant telephoned and said he had to leave town. The next day, defendant called Judy and said he was on the road and that the voices were telling him that he had to keep going. Defendant told her that he could not talk long, in case her telephone was tapped.

On Wednesday, defendant telephoned twice. At 4:30 p.m., he told Judy he felt fine and wanted to talk to his wife and daughter. He also asked whether television showed him with or without a beard. He was thinking of coming back.

At 11 p.m., defendant telephoned again. He wanted to know if Judy had been in touch with his wife, and Judy told him that his wife was a nervous wreck. Judy advised him to come home. His voice was not unusual and he used a normal conversational tone.

On July 20, 1984, Judy was at home with a police officer when her brother arrived and was arrested. Defendant told the officer he wanted to leave his duffle bag, which contained cash, with Judy. Defendant called later that day from the police station to tell Judy that he did not hold her responsible for turning him in and that he wanted her to have his duffle bag and the cash in it.

Anita Rios testified for the State that she tended bar at a tavern patronized by the defendant about twice a week in the mornings. She had known him for two years. He used to be employed to clean the tavern. He was usually calm and had never complained about losing his memory. She had seen him drunk once or twice, and his behavior would become very angry, belligerent and nasty.

On July 12, he came in at about 9 a.m. He stayed for a half hour, and drank two beers. He mentioned that he had to build a birdhouse for his ex-landlady, a 70-year-old who lived across the street. He said that "he was going to go over there and rape her and do things to her." Rios admonished him for making such threats, and defendant left.

He returned one hour later and made several telephone calls. He had 1½ beers. Defendant argued with another customer, and Rios refused to serve defendant any more drinks. He left at about 11 a.m.

Rios testified on cross-examination that she previously told defense counsel she thought defendant had been drinking or taking drugs before he came in. She had never seen him act like that before.

George Moore, a police officer, testified for the defense that on July 12, he was with his wife, Peggy, and defendant's sister Judy, when he spoke with defendant in front of Judy's house. Defendant shook hands with Moore when introduced to him. At this point, everything seemed fine. When defendant walked a short distance to speak with Judy, he seemed "anxious, but that is about it."

Moore continued, "Then he started, you know, saying he had hurt someone, then when he started saying this I went to go toward him and he told me to stop." Moore testified further, "Judy was asking him what had happened and he said I hurt someone, I hurt them bad." Moore continued: "[H]e was talking about it saying that they wouldn't find her, it would be a few days before anyone found her and they were asking him where she was so they could get some help for her, and he said they couldn't help her, that he had hurt her bad, that he had killed her." After defendant left, Moore telephoned the police.

Officer Winfield Wendt testified for the defense that on July 26, he spoke with defendant at the police station. After being read his *Miranda* rights and indicating he understood, defendant stated he knew nothing about the murders. The last thing he remembered was being in a tavern, then remembered nothing until he was on a bus leaving Indianapolis for Los Angeles. Defendant also mentioned that he had been getting headaches for six months. He did not mention about hearing voices. Defendant denied that he was crazy.

Carol Williams, defendant's wife, testified for the defense that defendant was a good husband and father. It was only when he drank that he would do crazy things. Carol thought he had quit drinking for the past two years. Just before the murders, they had been in Wisconsin on vacation. They returned on July 9. During the vacation, defendant complained of headaches and went to see a chiropractor in Wisconsin.

On July 12, Judy telephoned Carol at work, said defendant had been drinking, "and she said that he was crazy, he was talking suicide and talking that he was going to kill somebody." She and Judy later found bloody clothing and towels in Carol's home.

Dr. Henry Conroe, a psychiatrist, testified as an expert witness for the defense. He opined that on July 12, 1984, defendant was able to appreciate the criminality of his conduct. He could understand that what he was doing was wrong, but he was not able to conform his conduct to the requirements of the law. Dr. Conroe described the basis of his opinion:

> "DR. CONROE: Well, first is that he had a mental disease on that day, and what gave me the evidence for it was the accounts that his sister gave of his making these phone calls, of his compelling force being with him as he spoke to her as a voice being in his head telling him to kill and his being unable to resist that, this voice coming and it was outside of his control, and his being unable to fend it off and leading to his carrying out actions that were in accordance with the voice.
>
> He could not control his behavior because of this compelling force within himself that came out in the form of this voice within his head."

Dr. Conroe examined defendant July 12, 1985, for 2½ hours. He also reviewed all reports and records, and interviewed defendant's wife. Initially, Dr. Conroe diagnosed two mental diseases, an isolated explosive disorder and chronic alcohol abuse. The day before he testified, he added the diagnosis of atypical psychosis with depressive features, based on the fact that defendant reported hearing voices.

Dr. Conroe testified that the basis for his diagnosis of psychosis was that defendant had a break with reality, as evidenced by his sister's report of his hearing voices. Dr. Conroe saw nothing in the records to indicate the report of hearing voices was not true. Defendant might not have mentioned the voices to Dr. Conroe because he did not remember. Defendant's psychosis was also indicated by the age of the victims. In regard to the diagnosis of isolated explosive disorder, Dr. Conroe testified that the disorder occurs when someone who is usually not impulsive or aggressive suddenly shows explosive behavior "out of proportion to any sort of stress, sometimes felt as if it is a compelling force within the person to act, and they don't know where it comes from, but their behavior is controlled by that." Dr. Conroe knew there was a past violent criminal record, including a charge of rape, and a conviction for armed robbery, but still believed the explosive disorder precipitating the murders was "isolated."

Dr. Conroe pointed to defendant's heavy alcohol abuse to support his opinion and diagnoses. In the interview, defendant denied having any DT's. There was no history of psychosis before or after the murders.

Dr. Anthony Gaspero, a clinical psychologist, testified as an expert for defendant. In his opinion, at the time of the offenses, defendant lacked the ability to understand the criminality of his behavior and lacked the ability to control that behavior. Dr. Gaspero examined defendant on April 23, 1985, for two hours; on May 1, 1985, for three hours; and on February 19, 1986, for two hours. He also interviewed defendant's wife on the telephone for an hour.

Dr. Gaspero believed it was important to read all records, but did not believe in reviewing any records supporting an opinion contrary to his own. He would not read social histories taken by the Psychiatric Institute, even though they might contain information to corroborate or discount, e.g., defendant's report of his alcohol abuse history.

Dr. Gaspero's final diagnosis was that defendant suffered from a dysthymic disorder, an obsessive compulsive disorder, and psychothymic disorder, and sexual sadism. He also found psychosexual disorder paraphelia, a very rare condition. For that to occur, it was necessary that there be a moderate to severe depression, and "we must have black out, we must have the obsessive compulsive anxiety," and the excessive use of a tranquilizing drug such as alcohol.

Because no blood-alcohol levels were taken from defendant at the time of the murders, Dr. Gaspero could not be sure how much defendant had been drinking that day. He believed that defendant had no memory of events occurring after he left the tavern. Dr. Gaspero recalled that defendant had blacked out two or three other times in his life, but there was no notation of that history in his records. Dr. Gaspero believed that defendant was extremely dangerous when drinking alcohol.

Dr. Gaspero believed it was possible that defendant was having auditory hallucinations at the time of the murders. He did not believe defendant was malingering. Dr. Gaspero thought there was neurological and physiological damage to defendant caused by alcohol abuse. Dr. Gaspero explained that the reason that defendant would attack an older woman was "he is looking at that person as a person from his past and his emotional history who he fears," such as his stepmother.

The State offered the rebuttal testimony of Dr. Robert A. Reifman, a psychiatrist and the director of the Psychiatric Institute of the circuit court of Cook County. Dr. Reifman opined that defendant was not insane at the time he committed the offenses and that he suffered

from no mental disease or defect. Dr. Reifman believed that defendant had a substantial capacity to appreciate the criminality of his conduct on July 12, and had a substantial capacity to conform his conduct to the requirements of the law.

On December 3, 1985, Dr. Reifman examined defendant for less than an hour. Previously he had reviewed psychological exams done by Custom Organics, Dr. Conroe's report, police reports and criminal records, Dr. Grossman's psychological work-up, a social history given by Judy, and defendant's confession. He diagnosed dysthymic disorder, which is a condition of personality where a person goes through life in a depressed state, always sad, always feeling inadequate, having recurrent thoughts of death and suicide and generally pessimistic about life. In reviewing the records shortly before trial, it occurred to Dr. Reifman that the diagnosis of antisocial personality disorder would also be valid.

Dr. Reifman testified that, although Judy reported defendant's hearing voices, defendant did not verify that information because he denied having any memory of the events. Dr. Reifman noted that hearing voices is "hard to verify, but he never reported hallucinations or voices in the past and he subsequently has not heard voices except or complained about voices since coming into the jail after the several days. *** But ordinarily when you hear voices that are of psychotic concern you hear them from outside your head, not within your head." If he was hearing voices, it was probably a result of alcohol intake, although it was not clear how much he drank prior to the crimes. Dr. Reifman had "never seen a case in which hallucinations came from the head that appeared to be valid [to] me."

Dr. Reifman testified further that he found no evidence of psychosis, i.e., that defendant was never out of contact with reality, and that he did not know what he was doing. Dr. Reifman noted that psychosis was not something which could suddenly occur, then disappear after the crimes were completed. Dr. Reifman believed that defendant's antisocial personality disorder was indicated from defendant's childhood criminal history, truancy, suspensions from school, carrying into adulthood a criminal record, and impulsive behavior.

Defendant first contends that reversal of his convictions is required because he established by a preponderance of the evidence that he was insane at the time he committed the offenses, and the State failed to refute that showing.

■ A person is not criminally responsible for his conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct

or to conform his conduct to the requirements of law. Ill. Rev. Stat. 1985, ch. 38, par. 6—2.

■ The law presumes that all persons are sane. (*People v. Fosdick* (1988), 166 Ill. App. 3d 491, 519 N.E.2d 1102.) As of January 1, 1984, defendant bears the burden of proving the defense of insanity by a preponderance of the evidence. Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e); *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001.

■ If the opinions of the expert witnesses on the issue of insanity conflict, the trier of fact may accept one expert's opinion over another. (*People v. Moore* (1986), 147 Ill. App. 3d 881, 498 N.E.2d 701; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.) The weight to be given an expert's opinion depends upon the reasoning and factual details used to support that opinion. *People v. Jackson* (1987), 170 Ill. App. 3d 77, 522 N.E.2d 577; *People v. Martinez* (1980), 86 Ill. App. 3d 486, 408 N.E.2d 358.

Defendant maintains that the opinions of the defense experts "were clearly superior to that of the State's Dr. Reifman."

■ The expert testimony was in considerable conflict. The experts disagreed both as to their conclusions and as to the bases for their findings. The defense experts not only disagreed with the State's expert, but also disagreed with each other. See *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.

Dr. Conroe believed defendant was insane at the time of the crimes and unable to conform his conduct to the requirements of the law, although he was able to appreciate the criminality of his conduct. Dr. Gaspero also thought defendant was insane and unable to conform his conduct, but he believed, unlike Dr. Conroe, that defendant was not able to appreciate the criminality of his conduct. Dr. Reifman believed defendant was sane, suffered from no mental illness, could conform his conduct to the law, and could appreciate the criminality of his conduct.

The three expert witnesses also disagreed about the significance of certain facts which were relevant to whether or not defendant was sane at or about the time he committed the murders. For example, they disagreed about the relevance of facts that defendant: went to see his sister after killing Smith; withdrew money to leave town; sounded normal and conversational when he telephoned his sister; could drive a car; knew he had to get rid of the car to evade police; could not remember the crimes; suffered from headaches; stole rings from the victims; had a long history of violent criminal behavior; and cleaned up blood after the murders. In deciding whether or not

defendant was sane, the jury need not have accepted the defense experts' opinions that many of these facts were not significant.

The defense experts' explanation for defendant's confession could also be rejected by the jury in evaluating whether defendant was insane. Dr. Conroe explained that defendant "felt terrible about what had happened and tried to push it out of his memory, and in so doing forgot and it came back to haunt him, and when he was questioned specifically he was able to provide information but he constantly tried to push it out of his mind, the memory of what happened." In contrast, Dr. Gaspero thought the confession was not significant because he believed that defendant was fed the information.

Dr. Conroe diagnosed atypical psychosis. Dr. Gaspero disagreed, stating that he believed there was no such thing as psychosis. Dr. Reifman also disagreed, stating that he found no evidence of psychosis or other mental disease. Moreover, psychosis would certainly not suddenly occur, with no evidence of a pre-existing condition before or after the crime, and then disappear again when the crime was complete. Dr. Conroe, however, testified that defendant could fade in and out of a psychotic state. The jury could also reject Dr. Conroe's explanation that defendant did not appear psychotic now because he was on medication. According to Dr. Conroe, it did not matter if defendant was not taking the drugs, but was trading them with other prisoners for cigarettes.

The basis of Dr. Conroe's diagnosis of psychosis was that Judy reported "there were voices inside his head telling him to kill. And this was clearly a break with reality." Dr. Conroe explained that defendant might have failed to mention the voices in their interview because he did not remember them.

The fact that defendant claimed to hear voices prior to the offenses does not mandate a finding of insanity. See, e.g., People v. Redmond (1974), 59 Ill. 2d 328, 320 N.E.2d 321; People v. Tylkowski (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1122; People v. Bouchard (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001; People v. Moore (1986), 147 Ill. App. 3d 881, 498 N.E.2d 701; People v. Jones (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261; People v. Ureste (1972), 7 Ill. App. 3d 545, 288 N.E.2d 45.

Moreover, Dr. Reifman testified that the hallucinations were subjective and not verifiable by either defendant's previous or subsequent conduct or history, and thus hearing voices was inconclusive as far as forming a basis for an opinion that he was insane. (See People v. Ureste (1972), 7 Ill. App. 3d 545, 288 N.E.2d 45; People v. Jackson (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.) Dr. Reifman stated that

when defendant was reporting hearing voices to his sister, it was "hard to know at this time whether he was actually hearing voices or they were his own thoughts or he was discussing his urges."

Dr. Reifman also explained that "ordinarily when you hear voices that are of psychotic concern you hear them from outside your head, not within your head." Dr. Reifman pointed out that he had "never seen a case in which hallucinations came from [inside] the head that appeared to be valid." In addition, defendant did not mention hearing voices to the police. The confession contains no mention of voices, hallucinations or blackouts.

The jury could also have rejected Dr. Gaspero's diagnosis of psychosexual disorder paraphelia and sexual sadism. The paraphelia was a "very rare condition indeed," because defendant acted both sadistic and homicidal. For that to occur, it was necessary that there be an alcohol-induced blackout. As proof that defendant actually suffered blackouts, Dr. Gaspero pointed to neurological damage and a history of blacking out two or three times previously. He did not write down this "history" in his report. He found neurological damage despite the fact that no other examining professional found such damage. He did not order neurological tests; nor was he aware that the EEG showed no neurological damage.

Dr. Gaspero's intentional disregard of the records, and his statement that they were not important to his final opinion, also undermines his credibility. He refused to read other reports because they might bias his view. Incredibly, he would not even read social histories to find facts, e.g., determining defendant's drinking problems, which were the basis of his expert opinion on insanity and his diagnosis of defendant. See People v. Jackson (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979. Cf. People v. Tylkowski (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1112 (jury could accept expert's explanation for disregarding references to defendant's hallucinations in hospital records; goes to weight of his testimony).

The defense experts focused heavily on defendant's use of alcohol. The jury need not have believed that defendant's use of alcohol caused him to commit the crimes. See People v. Deizman (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208; see also People v. Christiansen (1987), 116 Ill. 2d 96, 506 N.E.2d 1253; People v. Wiley (1989), 185 Ill. App. 3d 1097, 541 N.E.2d 1345.

In regard to the blackouts, Dr. Reifman testified that in his experience total amnesia is "extremely rare and unlikely." If there were amnesia, it would usually be sketchy or partial. "But total amnesia for the incident in view of his behavior at the time of the crime, in view

of the [confession] he made is inconsistent."

Defendant maintains that Dr. Reifman's interview was too brief, and too distant from the time of the crimes, to deserve any weight. This argument goes to the weight of the testimony, which is a decision for the trier of fact. See *People v. Hickman* (1986), 143 Ill. App. 3d 195, 492 N.E.2d 1041.

In view of the numerous conflicts in the experts' opinions, the jury was entitled to reject the defense experts in favor of the State's expert. Moreover, the testimony of the State's lay witnesses tended to support Dr. Reifman's conclusions.

██ The jury may reject all expert testimony and conclude defendant was sane based solely on lay testimony. (*People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001; *People v. Marshall* (1983), 114 Ill. App. 3d 217, 448 N.E.2d 969; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.) Lay observations are especially relevant on the issue of defendant's sanity at the time of the offense if they are based on observations made shortly before or after the crime was committed. *People v. Gindorf* (1987), 159 Ill. App. 3d 647, 512 N.E.2d 770; *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001; *People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.

 █ The existence of a plan for a crime, and methods to prevent detection, are relevant factors in determining a defendant's sanity. (*People v. Skorka* (1986), 147 Ill. App. 3d 976, 498 N.E.2d 607; *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001.) In the present case, defendant tried to prevent detection. For example, in his confession, defendant stated that after murdering Smith, he went home, washed, and got rid of his bloody clothes. See *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1112; *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001.

In addition, defendant became angry with his sister when he discovered she had telephoned the police. He made her promise not to call again. He also managed to evade the police when they came to the tavern in response to Judy's call. Defendant convinced the bartender, a friend, to tell the police he was not in the tavern. Defendant also reported that he registered in a motel under an assumed name. See *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.

Defendant also went to the bank and obtained a $2,000 cash advance on a credit card. (See *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.) Defendant stated that he needed the money because he would be on the road, trying to evade the police.

Defendant was functioning well enough to make numerous telephone calls just before and after the crimes. (See *People v. Wiley* (1989), 185 Ill. App. 3d 1097, 541 N.E.2d 1345.) He telephoned his sister repeatedly, and even drove to her house to report the first murder. Defendant stated that he did not inform Judy of his location specifically because he was trying to avoid the police. Moreover, defendant expressed concern that his sister's telephone was tapped. (See *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.) Defendant's statements to his sister and to the police, describing the killings and sexual assaults, also supported a finding that he was sane at the time of the offenses. See *People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.

In addition, Judy testified that there was nothing unusual about defendant's speech or appearance on the day of the murders. (See *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001; *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1112; *People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261; *People v. Ureste* (1972), 7 Ill. App. 3d 545, 288 N.E.2d 45.) The bartender, Rios, testified that defendant had only 3½ beers that morning. Judy repeatedly stated that defendant did not seem intoxicated, although she believed he had been drinking a little. When he came to her home on July 12, she smelled no alcohol. Moore, a police officer, saw defendant just after the first murder, and he did not describe defendant as appearing to be intoxicated. Moore stood close enough to defendant to shake his hand and observed him for several minutes. When defendant was arrested, he seemed coherent to the police. See *People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321; *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1112; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208; *People v. Ureste* (1972), 7 Ill. App. 3d 545, 288 N.E.2d 45.

Moreover, the absence of either prior mental treatment or prior irrational conduct of this type is of importance in determining the sanity of accused at the time of the offense. (*People v. Harrington* (1974), 22 Ill. App. 3d 938, 317 N.E.2d 161.) In the present case, there was no history of prior mental treatment or similar types of irrational conduct, or hearing voices. Rios testified she had known defendant for two years. He had never complained of blackouts or mental problems. Defendant reported that he had suffered only one blackout prior to July 12, and that blackout occurred 18 years earlier. Dr. Conroe stated there was no evidence of delusional thinking in the past.

The fact that several witnesses testified that at some point on

July 12, defendant appeared upset, or anxious, or made threats they had never heard him make before, does not require the jury to ignore the other witnesses' testimony on the issue. See, *e.g., People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1112; *People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261.

We hold that defendant failed to carry his burden of proving his insanity by a preponderance of the evidence.

Defendant next contends that the jury was improperly influenced by the court's statements adversely reflecting on defense counsel and on defense witness Dr. Gaspero.

■ A court's comments should not have an effect on jurors, and the jury should not be swayed by judicial opinion either directly or indirectly. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) A trial court may, however, properly attempt to fulfill its responsibility for achieving prompt and convenient dispatch of its business. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) In addition, the court must see that the proceedings are conducted in an orderly manner with proper decorum, and the control of the conduct of the trial rests within its discretion. *People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389. See also *People v. Banks* (1974), 17 Ill. App. 3d 746, 308 N.E.2d 261.

For example, defendant complains that the court admonished the defense expert by saying, "Doctor, would you do me a favor? Answer the question yes or no, don't ramble." And: "The witness has a tendency to ramble. These are yes or no questions and a date is a date."

■ The remarks complained of, when taken in context, were made within the court's discretion and were not attempts to discredit the witness or the defense in general. We hold that the remarks did not substantially prejudice defendant or deny him a fair trial. (See, *e.g., People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183; *People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389; *People v. Mahaffey* (1978), 60 Ill. App. 3d 496, 377 N.E.2d 85.) We note also that the trial court admonished the prosecutor several times regarding Dr. Reifman's responses to questions.

■ Defendant next contends that reversal is required because the jury instruction explaining the verdict of "guilty but mentally ill" misstated the law because it said the State's burden was to show defendant was not insane by a preponderance of the evidence, when the actual burden is beyond a reasonable doubt. The State concedes that the instruction was improper under *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.

The State argues, however, that the issue was waived. The *Fierer*

court refused to find waiver because certain basic instructions, such as those stating the burden of proof, must be given and the concept of waiver will not be employed in the absence of such instructions. (*Fierer*, 124 Ill. 2d at 187, 529 N.E.2d at 976.) On that basis, we also must reject the waiver argument.

We hold, however, that the error was harmless beyond a reasonable doubt. The court in *Fierer* rejected an argument that the error was harmless, because the improper instruction might have affected the outcome. (*Fierer*, 124 Ill. 2d at 187-88, 529 N.E.2d at 976.) The present case, however, differs from *Fierer*.

In *Fierer*, the jury found defendant guilty but mentally ill. The supreme court was not willing to speculate whether the result of the case could have differed if the jury had been properly instructed, and thus the error was not harmless. In contrast, in the present case, the jury found defendant guilty. It rejected the verdict of guilty but mentally ill.

The prerequisite to a finding of insanity, under any standard, is that defendant suffered from a mental illness. By rejecting the verdict of guilty but mentally ill, the jury emphatically found no mental illness. Therefore, this court need not speculate as to whether the jury believed defendant was *not* mentally ill. We conclude that the error in the guilty but mentally ill instruction was harmless beyond a reasonable doubt. Because the jury rejected the guilty but mentally ill verdict, the error could not have affected the result of the trial.

In *People v. Cooney* (1985), 136 Ill. App. 3d 989, 484 N.E.2d 802, the jury was instructed on the special verdict of guilty but mentally ill when there was no evidence of mental impairment, and the jury returned a verdict of guilty. We found no error:

> "[Defendant] has not explained how, under these circumstances, erroneously instructing the jury on the special verdict of 'guilty but mentally ill' could be anything but harmless." (*Cooney*, 136 Ill. App. 3d at 1009, 484 N.E.2d at 815.)

The same language applies to the case before us.

Defendant finally argues that he was denied a fair trial where the court excused for cause all potential jurors opposed to the death penalty, and thus "he was tried before a jury organized to convict him because of its opposition to the insanity defense." The courts in Illinois have rejected this argument, and we find no reason to change that precedent. See *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174; *People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046; *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

Defendant cites "The Death-Qualified Jury and the Defense of In-

sanity," 8 *Law & Human Behavior* 81, 83 (June 1984), where the authors concluded that the removal of potential jurors who are against the death penalty causes the jury to be less likely to accept insanity as a valid defense because "people with a strong crime control ideology would be more likely to vote for conviction in a case involving the insanity defense than people with a strong due process ideology." The United States Supreme Court, however, has rejected an argument based on that same article. (*Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758. See also *People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415.) We hold that no error occurred here.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and RAKOWSKI, JJ., concur.